Nos. 2023-1777, -1779

# United States Court of Appeals
# for the Federal Circuit

**TRUDELL MEDICAL INTERNATIONAL,**

*Plaintiff-Appellant*

v.

**D R BURTON HEALTHCARE, LLC**

*Defendant/Counter-Claimant-Cross-Appellant*

Appeals from the United States District Court for the Eastern District for North Carolina in No. 4:18-cv-00009-BO, Judge Terrence William Boyle

## PLAINTIFF-APPELLANT TRUDELL MEDICAL INTERNATIONAL'S OPENING BRIEF

William H. Frankel (*Counsel of Record*)
David P. Lindner
Laura A. Lydigsen
Judy K. He
CROWELL & MORING LLP
NBC Tower – Suite 3600
455 N. Cityfront Plaza Drive
Chicago, Illinois 60611
(312) 321-4200

July 20, 2023

*Attorneys for Plaintiff-Appellant,*
*Trudell Medical International*

## U.S. Patent No. 9,808,588

Claim 1: A respiratory treatment device comprising:

an inlet configured to receive exhaled air into the device;

an outlet configured to permit air to exit the device;

an opening positioned in an exhalation flow path defined between the inlet and the outlet;

a blocking segment configured to rotate relative to the opening between a closed position where the flow of air through the opening is restricted, and an open position where the flow of air through the opening is less restricted; and,

a vane configured to rotate the blocking segment between the closed position and the open position in response to the flow of air through the opening;

wherein a size of a blocking surface of the blocking segment is equal to or greater than a size of the opening.

Claim 9: A respiratory treatment device comprising:

an inlet configured to receive exhaled air into the device;

an outlet configured to permit air to exit the device;

an opening positioned in an exhalation flow path defined between the inlet and the outlet, the opening having a generally oblong cross-sectional shape comprising a shorter first dimension and an elongated second dimension perpendicular to the first dimension; and,

a blocking segment configured to translate relative to the opening along the shorter first dimension between a closed position where the flow of air through the opening is restricted, and an open position where the flow of air through the opening is less restricted;

wherein a size of a blocking surface of the blocking segment is equal to or greater than a size of the opening.

i

Claim 18: A respiratory treatment device comprising:

an inlet configured to receive exhaled air into the device;

an outlet configured to permit air to exit the device;

an opening positioned in an exhalation flow path defined between the inlet and the outlet, and,

a blocking segment configured to translate relative to the opening between a closed position where the flow of air through the opening is restricted, and an open position where the flow of air through the opening is less restricted;

wherein a side profile of the blocking segment is shaped to mate with a side profile of the opening, when the blocking segment is in the closed position; and,

wherein a size of a blocking surface of the blocking segment is equal to or greater than a size of the opening.

# CERTIFICATE OF INTEREST

Counsel for Appellant, Trudell Medical International, certifies the following:

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Trudell Medical International | | Trudell Partnership Holdings Limited |
| | | Packard Medical Supply Centre Ltd. |

**4.    Legal Representatives. The names of all law firms, partners, and associates that have not entered an appearance in the appeal, and (A) appeared for the entity in the lower tribunal; or (B) are expected to appear for the entity in this court.**

Brinks Gilson & Lione
Womble Bond Dickinson

Jafon L. Fearson, formerly with Crowell & Moring LLP

John F. Morrow, Jr., Womble Bond Dickinson
Samuel B. Hartzell, Womble Bond Dickinson
Madison B. Waller, Womble Bond Dickinson

David R. Boaz, formerly with Womble Bond Dickinson

**5.    Related Cases. An indication as to whether there are any related or prior cases, other than the originating case number(s), that meet the criteria under Federal Circuit Rule 47.5.**

Another unrelated patent infringement litigation is pending in the E.D.N.C. between D R Burton Healthcare LLC and Trudell Medical International.  Case No. 4:19-cv-131-BO involves a different patent and is not related to the present appeal under the criteria set out in Fed. Cir. R. 47.5(a).  Trudell is informing the Court of Case No. 4:19-cv-131-BO because the district court judge *sua sponte* stayed that case pending final disposition of this appeal.

**6.      Organizational Victims and Bankruptcy Cases. All information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases.**

None/Not Applicable

July 20, 2023                                    /s/ *Judy K. He*

**TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ............................................................... iii

TABLE OF CONTENTS ........................................................................ v

TABLE OF AUTHORITIES .............................................................. viii

TABLE OF ABBREVIATIONS ........................................................ xii

STATEMENT OF RELATED CASES ............................................. xiii

JURISDICTIONAL STATEMENT .................................................... 1

STATEMENT OF THE ISSUES ........................................................ 2

STATEMENT OF THE CASE ............................................................ 3

I.      PRELIMINARY STATEMENT ................................................ 3

II.     TRUDELL DEVELOPS THE LEADING PATENTED RESPIRATORY THERAPY DEVICE FOR CLEARING PATIENTS' LUNGS. ........................................................... 4

       A.    OPEP Therapy .............................................................. 4

       B.    Technology of the '588 Patent ..................................... 6

III.    BURTON'S ACCUSED PRODUCTS USE TRUDELL'S PATENTED TECHNOLOGY. ................................................ 8

IV.    TRUDELL FILES SUIT TO ENFORCE ITS PATENT RIGHTS .............. 10

       A.    Pre-Trial Proceedings .................................................. 10

             1.    Claim Construction Decision ............................. 11

             2.    Status and Pre-Trial Conferences ...................... 12

       B.    Trial .............................................................................. 16

       C.    Post-Trial ...................................................................... 19

SUMMARY OF ARGUMENT ......................................................... 19

ARGUMENT ...................................................................................... 21

I.      STANDARD OF REVIEW ...................................................... 21

II.     THE DISTRICT COURT ABUSED ITS DISCRETION BY ALLOWING BURTON'S CLAIM CONSTRUCTION DECLARANT TO TESTIFY AS AN EXPERT WITNESS WHEN HE NEVER SERVED AN EXPERT REPORT. ......................................... 23

A.    Collins' Testimony Should Have Been Automatically Excluded Because It Was Not Timely Disclosed under FRCP 26. ...................23

B.    Collins' Testimony Lacked Support and Should Have Been Excluded as Unreliable Under the FRE 702.................................28

C.    The Prejudice to Trudell in Having Collins Testify Notwithstanding These Issues Was Substantial. ................................33

    1.    Without Collins' Testimony, Trudell Would Have Prevailed In Proving Infringement. ..........................................33

    2.    Collins' Testimony Misapplied the Court's Claim Construction And Was Prejudicial. ..........................................34

III.    THE DISTRICT COURT ERRED IN DENYING TRUDELL'S MOTION FOR RENEWED JMOL WITH RESPECT TO INFRINGEMENT AND MOTION FOR NEW TRIAL. ...........................40

A.    In View of Trudell's Overwhelming Evidence of Infringement of Claims 1-7, 9, and 18, No Substantial Evidence Exists for a Reasonable Jury to Have Found Non-Infringement. .........................41

    1.    The Accused Products Include All of the Limitations of Claims 1-7...............................................................42

    2.    The Accused Products Include All of the Limitations of Claim 9.....................................................................45

    3.    The Accused Products Include All of the Limitations of Claim 18...................................................................47

    4.    Burton Did Not Challenge or Impeach Durgin's Infringement Analysis During Cross-Examination. .................49

    5.    Collins' Conclusory, Prejudicial and Untimely Disclosed Opinions Failed to Rebut Durgin's Testimony. ......................50

    6.    The Court Should Have Granted JMOL of Infringement.........54

B.    The Court Should Order A New Trial Because Letting the Jury's Verdict of Non-Infringement Stand is Against the Clear Weight of the Evidence and Would Result in a Gross Miscarriage of Justice. .......................................................55

    1.    The District Court Abused Its Discretion in Finding that the Trial Judge's Objectionable Statements Made to the Jury Did Not Result in Unfair Prejudice to Trudell.................56

2.    The District Court Abused Its Discretion in Finding
      Collins' Testimony Admissible.................................................58

IV.    THIS COURT SHOULD ORDER REASSIGNMENT ON
       REMAND.....................................................................................60

CONCLUSION AND RELIEF SOUGHT ............................................................63

CERTIFICATE OF SERVICE .............................................................................64

CERTIFICATE OF COMPLIANCE ....................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*,
   466 F.3d 1000 (Fed. Cir. 2006) ...............................................................34, 40

*Akeva L.L.C. v. Mizuno Corp.*,
   212 F.R.D. 306 (M.D.N.C. 2002) .....................................................................27

*Apple Inc. v. Wi-LAN Inc.*,
   25 F.4th 960 (Fed. Cir. 2022) .............................................................22, 56, 58

*ATEN Int'l Co. v. Uniclass Tech. Co.*,
   932 F.3d 1364 (Fed. Cir. 2019) .........................................................................29

*Beach Mart, Inc. v. L&L Wings, Inc.*,
   784 Fed. App'x 118 (4th Cir. 2019) ....................................................61, 62, 63

*BorgWarner, Inc. v. Honeywell Int'l, Inc.*,
   750 F. Supp. 2d 596 (W.D.N.C. 2010) .................................................23, 28, 34

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1983)..........................................................................41, 50, 54, 55

*Burroughs v. United States*,
   365 F.2d 431 (10th Cir. 1966) ...........................................................................56

*ClearValue, Inc. v. Pearl River Polymers, Inc.*,
   668 F.3d 1340 (Fed. Cir. 2012) .........................................................................21

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*,
   424 F.3d 1168 (Fed. Cir. 2005) .........................................................................29

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)............................................................................................29

*Goebel v. Denver & Rio Grande W. R.R. Co.*,
   215 F.3d 1083 (10th Cir. 2000) .............................................................30, 31, 33

*G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*,
    822 F.3d 709 (4th Cir. 2016), *vacated on other grounds by* 137 S.
    Ct. 1239 (2017) ........................................................................60, 61, 62

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
    757 Fed. App'x 974 (Fed. Cir. 2019) ....................................41, 50, 55

*Int'l Visual Corp. v. Crown Metal Co.*,
    991 F.2d 768 (Fed. Cir. 1993) ...............................................30

*Johnson v. MBNA Am. Bank, NA*,
    357 F.3d 426 (4th Cir. 2004) ................................................22

*Kearns v. Chrysler Corp.*,
    32 F.3d 1541 (Fed. Cir. 1994) ..............................................22

*Lucas v. Am. Mfg. Co.*,
    630 F.2d 291 (5th Cir. 1980) ................................................56

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
    429 F.3d 1344 (Fed. Cir. 2005) ............................................27

*Myrick v. Prime Ins. Syndicate, Inc.*,
    395 F.3d 485 (4th Cir. 2005) ................................................22

*Nease v. Ford Motor Co.*,
    848 F.3d 219 (4th Cir. 2017) .......................................26, 30, 31, 32

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ............................................52

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
    653 F.3d 1296 (Fed. Cir. 2011) ............................................52

*Rsch. Corp. Techs. v. Microsoft Corp.*,
    536 F.3d 1247 (Fed. Cir. 2008) ............................................60

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
    318 F.3d 592 (4th Cir. 2003) ....................................................*passim*

*Sardis v. Overhead Door Corp.*,
    10 F.4th 268 (4th Cir. 2021) .......................................21, 29, 30, 31, 32

*Saudi v. Northrop Grumman Corp.*,
    427 F.3d 271 (4th Cir. 2005) ...............................................................23

*Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
    637 F.3d 1269 (Fed. Cir. 2011) .........................................................21

*Southco, Inc. v. Fivetech Tech. Inc.*,
    611 Fed. App'x 681 (Fed. Cir. 2015)...............................23, 24, 32, 33

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
    550 F.3d 1356 (Fed. Cir. 2008) .........................................................21

*Swimways Corp. v. Zuru, Inc.*,
    No. 2:13-cv-334, 2014 WL 12573390 (E.D. Va. July 10, 2014)...............26, 27

*TQ Delta, LLC v. CISCO Sys., Inc.*,
    942 F.3d 1352 (Fed. Cir. 2019) ...................................41, 50, 51, 55

*TriMed, Inc. v. Stryker Corp.*,
    608 F.3d 1333 (Fed. Cir. 2010) .........................................................60

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
    308 F.3d 1167 (Fed. Cir. 2002) .........................................................39

*United States v. Diamond*,
    430 F.2d 688 (5th Cir. 1970) .............................................................57

*United States v. Perry*,
    335 F.3d 316 (4th Cir. 2003) .............................................................22

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000)............................................................................40

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) .............................................................41

*Wickersham v. Ford Motor Co.*,
    997 F.3d 526 (4th Cir. 2021) .............................................................21

*Williams v. Nichols*,
    266 F.2d 389 (4th Cir. 1959) ...............................................22, 56, 59

*Witco Chem. Corp. v. Peachtree Doors, Inc.*,
   787 F.2d 1545 (Fed. Cir. 1986) ...................................................................56, 58

**Statutes**

28 U.S.C. § 1295(a)(1).............................................................................1

28 U.S.C. § 1331....................................................................................1

28 U.S.C. § 1338(a) ...............................................................................1

**Other Authorities**

Fed. R. Civ. P. 26...........................................................................*passim*

Fed. R. Civ. P. 37(c)(1)............................................................20, 24, 27

Fed. R. Evid. 702 ...................................................................4, 28, 30, 32

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '588 Patent | U.S. Patent No. 9,808,588 (Appx132) |
| Burton | D R Burton Healthcare, LLC |
| JMOL | Judgment as a Matter of Law |
| M&R | Magistrate Memorandum and Recommendation on Claim Construction (Appx23) |
| MIL | Motion *in Limine* |
| Trudell | Trudell Medical International |
| court | District Court |
| Collins | Dr. John Collins |
| Durgin | Dr. William Durgin |

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action was previously before this Court or any other appellate court.

Another unrelated patent infringement litigation is pending in the E.D.N.C. between Trudell Medical International and D R Burton Healthcare, LLC. Case No. 4:19-cv-131-BO involves U.S. Patent No. 10,413,698, which is not related to the present appeal under the criteria set out in Fed. Cir. R. 47.5(a). Trudell is informing the Court of Case No. 4:19-cv-131-BO because the district court judge *sua sponte* stayed that case pending final disposition of this appeal.

# JURISDICTIONAL STATEMENT

Trudell appeals from a final judgment that was entered by the court on November 10, 2022.  Appx1-2.  The court resolved timely post-judgment motions on March 1, 2023 (Appx6-13), which Trudell also appeals, and Trudell filed a timely notice of appeal on March 21, 2023.  Appx3328-3330.  The court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

I.      Whether the court abused its discretion by allowing Burton's claim construction declarant, Dr. John Collins, to provide opinions regarding non-infringement that had never before been disclosed to Trudell because Burton did not timely serve an expert report on infringement from Collins in accordance with Fed. R. Civ. P. 26(a)(2)(B).

II.     Whether Trudell was entitled to judgment of infringement as a matter of law (or at least a new trial) because there was no substantial evidence to support the jury's finding that Burton's Accused Products did not infringe the asserted claims literally or under the doctrine of equivalents.

III.    Whether the court's abuse of discretion warrants reassignment of this case to a different trial judge on remand to "minimize even a suspicion of partiality," as required by Fourth Circuit precedent.

**STATEMENT OF THE CASE**

## I.    Preliminary Statement

This is an appeal from a non-infringement jury verdict in a patent case involving respiratory therapy technology where the District Court was more interested in a fast trial, than a fair trial, and where the court abused its discretion by allowing the accused infringer to present its non-infringement defense through an expert witness who had neither served a timely Fed. R. Civ. P. 26 report nor been deposed on his non-infringement opinions before the court's last-minute and inexplicable decision to allow that expert to testify at trial.

Trial began on November 7, 2022.  Appx101.  Trudell presented its infringement case principally through its inventors and expert testimony from Dr. William Durgin.  Appx2140-2219(2:1-80:14), Appx2225-2377(4:2-154:15), 2455-2475(15:14-35:19).  Burton did not challenge Durgin's infringement proofs at trial, electing instead to use cross-examination to attack the validity of the patent-in-suit.  Appx2356-2374(133:20-151:23).  Burton presented only two witnesses at trial, its founder and President, Mr. Gregory Lau, and Collins.  Appx2477(37:8-15).  Lau never provided any testimony on non-infringement.    Appx2483-2505(43:9-65:8).  Had Collins' testimony been properly excluded, Burton would have had no evidence of non-infringement.  Appx2503-2504(63:11-15,64:10).

3

The court was frustrated with this case and rushed to get it over with. On the third and final day of trial, the court, without any explanation and contrary to a prior MIL ruling, allowed Burton, which chose not to serve any expert reports before the close of discovery, to present expert testimony from its prior claim construction declarant, Dr. John Collins. Appx2476-2477(36:24-37:15). Through Collins, Burton then exposed the jury to improper, untimely, and convoluted non-infringement opinions that lacked any support and should have been struck as unreliable under Fed. R. Evid. 702, and reargued claim construction positions that already had been rejected. Appx2483-2537(43:17-97:19).

Against this backdrop, the jury returned a verdict of non-infringement. Appx129-131. Reversal of the non-infringement verdict, which not only lacks substantial evidence support but is also against the clear weight of the evidence, is warranted. Judgment in Trudell's favor, with remand for damages, should be entered. At minimum, a new trial should be ordered.

## II.    Trudell Develops The Leading Patented Respiratory Therapy Device For Clearing Patients' Lungs.

### A.    OPEP Therapy

Millions of people across the world suffer from breathing problems caused by mucus trapped in the lungs, which can result in compromised airways, excess mucus build-up, serious lung infections, and in some instances, even death. Appx153(1:22-46), Appx403-406(¶¶30-39). Mucus is generally carried away from human lungs

and out of the body by traveling along the walls of airways, which are lined by tiny hairs called cilia. Appx153(1:23-28), Appx404(¶32). Humans who have certain respiratory conditions often struggle to clear excess mucus from their lungs in a safe and effective manner for various reasons (e.g., impaired ciliary activity resulting from thick, difficult to remove mucus and/or infections). Appx404-405(¶33).

Respiratory therapy can help these individuals with removing excess mucus from their lungs to improve their breathing. Appx153(1:22-46). One type of respiratory therapy that can be used is Oscillatory Positive Expiratory Pressure ("OPEP"), which involves delivering intermittent resistance and creating positive pressure and airflow oscillations in the user's airways to help loosen excess mucus from the walls of the airways upon exhalation. Appx405-406(¶¶36-39).

Generally, patients breathe in and out through an OPEP device for 10-20 breaths, then perform a series of "Huff Coughs" to clear any mucus from the airways. Appx806(¶39); *see also* Appx2150-2151(11:25-12:10). Each session repeats this process for 10-20 minutes, and a patient may perform 2-4 sessions per day. Appx806(¶39). In the context of OPEP devices, as a patient exhales, a valve repeatedly opens and closes to generate positive pressure oscillations which "stent" open the patient's airway while also gently vibrating to help dislodge mucus so that it can be moved to larger airways and coughed out. Appx807(¶42), Appx805-806(¶37); *see also* Appx2150-2151(11:25-12:10).

In 2013, Trudell launched its award-winning Aerobika® product, one of Trudell's many patented technologies that utilizes OPEP therapy to help improve respiratory care for patients and improve their quality of life. Appx2151-2152(12:16-13:5). When an Aerobika® user exhales, the user's air is directed down through the device towards a butterfly valve. Appx2456-2457(16:2-17:4). As the pressure builds, it will eventually cause the butterfly valve to open. Appx2459(19:6-14). Once the butterfly valve opens, the exhaled air will flow past the butterfly valve and acts on the vane that is connected to the butterfly valve. Appx2456(16:2-17:4), Appx2459(19:10-14). The air flow causes the vane to vibrate back and forth, which in turn causes the butterfly valve to close and open, thereby creating pressure pulses in the users lungs that loosens the mucus. Appx2457-2458(17:8-18:5), Appx2460(20:2-16).



Appx2906, Appx2891, Appx2456-2460(16:12-20:13).

**B.    Technology of the '588 Patent**

Trudell's '588 Patent is generally directed to portable OPEP devices and a method of performing OPEP therapy. Appx153(1:50-51). The '588 Patent explains that OPEP is advantageous "because it can be easily taught to most hospitalized patients" who can do the OPEP therapy themselves while hospitalized "and also once they have returned home." Appx153(1:41-45). As such, "a number of portable OPEP devices have been developed." Appx153(1:45-46).

The '588 Patent discloses a variety of these devices (e.g., Appx135-152(Figs. 1-18), including an embodiment that is breath-actuated, i.e., provides OPEP therapy by using a vane to harness energy in the user's breath (or exhaled air) as a force to rotate an air restrictor member in the device. Appx146-152(Figs. 12-18); *see also* Appx157-158(9:44-12:9). This configuration serves to i) provide intermittent resistance and create positive pressure and oscillations in the user's airways, and ii) loosen and eventually remove excess mucus from their lungs. Appx157-158(9:44-12:9). Trudell's breath-actuated, vane-driven Aerobika® device practices claims 1-5 and 7 of the '588 Patent. Appx157(9:58-65), Appx2455-2468(15:14-28:16), Appx2620-2623, Appx2714-2715, Appx2891-2906, Appx2826-2827.

The '588 Patent claims a moveable vane and blocking segment that provides improved OPEP therapy. Appx157(9:44-10:14). Figures 12-14 illustrate an exemplary breath-actuated OPEP device utilizing a vane (567, green) and blocking segment (546, yellow) to produce OPEP therapy:



FIG. 12                    FIG. 13                    FIG. 14

Appx146-148. As the '588 Patent makes clear, "[t]he restrictor members 542 may have any number of vanes 567 and blocking segments 546" (Appx157(10:54-56), Appx150) and varying degrees of rotation (including back and forth in opposite directions) are acceptable. Appx156(7:16-19), Appx157(9:36-43, 9:60-65).

## III.  Burton's Accused Products Use Trudell's Patented Technology.

Burton is in the business of selling OPEP devices in the United States, including the vPEP®, vPEP® HC, iPEP®, PocketPEP®, and PocketPEP® Advantage products (collectively, "Accused Products"). Appx2306-2307(83:25-84:7), Appx2310(87:20-22), Appx2468(28:12-16), Appx2310-2312(87:16-89:12), Appx2854-2855. The Accused Products are hand-held OPEP devices having an internal "flapper valve" that includes a restrictor member and provides OPEP therapy upon exhalation by responding to the exhaled airflow via opening and closing, which provides intermittent resistance and creates positive pressure and oscillations in the patient's airways. Appx2311-2312(88:17-89:12), Appx2855. The vPEP®, vPEP® HC, and PocketPEP® products all include a blocking segment

(part of the flapper valve that faces the opening) that is configured to rotate between a closed position and an open position (Appx2854-2855, Appx2861, Appx2310-2312(87:8-2-89:12), Appx2323-2324(100:17-101:23)), and a vane, which is a radial piece of structure extending from the blocking segment (Appx2326-2327(103:18-104:18)). The flapper valve's repeated transition between a closed and open position creates an oscillating pressure in a patient's lungs. Appx2323-2324(100:17-2-101:23). The iPEP® uses the PocketPEP® OPEP module to provide OPEP therapy and thus includes the same flapper valve as PocketPEP®, and operates in the same fashion. Appx2312(87:8-89:12).

Illustrative photos of the accused vPEP® device and its flapper valve are below:



Appx2617.




Appx2862 (vPEP® flapper valve in closed and open positions), Appx2323-
2324(100:17-2-101:23).

Burton began selling the Accused Products in the United States in January
2017, years after Trudell introduced its Aerobika® device. Appx2418-2419(195:10-
196:14), Appx2806-2808, Appx2815-2818.

## IV.  Trudell Files Suit To Enforce Its Patent Rights.

### A.  Pre-Trial Proceedings

On January 29, 2018, Trudell sued Burton for patent infringement. Appx69.
The parties filed Opening Claim Construction Briefs on November 22, 2019
(Appx81), and a Markman hearing was held before Magistrate Judge Swank on
October 22-23, 2020. Appx88. On January 20, 2021, this case was reassigned to
United States District Judge Terrence W. Boyle (Appx88) and, on August 23, 2021,
Judge Boyle assigned a new magistrate judge, Magistrate Judge Meyer, to issue a
M&R Regarding Claim Construction (Appx92).

### 1.    Claim Construction Decision

On March 21, 2022, over 500 days after the Markman Hearing, Magistrate Judge Meyer issued a 41-page M&R that adopted Trudell's proposed constructions for nine out of ten disputed terms, which was adopted in its entirety by the court on June 14, 2022. Appx93, Appx23-63, Appx14-22. The constructions of four of those terms are particularly pertinent in this appeal and discussed here.

First, the court construed "a vane" to mean "a blade or plate whose primary purpose is to convert kinetic energy in the form of fluid movement into rotational movement." Appx38. In doing so, the court found that "'a vane' should be construed broadly to mean one or more vanes," and rejected Burton's argument that "a vane" requires more than one vane. *Id.*

Second, the court construed "rotate relative to the opening" to mean "move a body relative to the opening about a point at a fixed radius." Appx42. In doing so, the court rejected Burton's argument "limiting the claim language to mean only a full rotation." Appx40.

Third, the court also construed "translate relative to the opening" to mean "move a body relative to the opening in a manner in which all parts of the body move . . . the same distance in the same amount of time." Appx46.

Finally, the court construed the term "generally oblong cross-sectional shape" to mean "cross section having a generally rectangular or elliptical shape, wherein its

larger dimension is longer than its shorter dimension." Appx49. In doing so, the court rejected Burton's narrow construction, which disregarded the term "generally" and would have excluded devices with a cross section that was not precisely elliptical or rectangular from the literal scope of the claim. Appx47-49.

### 2. Status and Pre-Trial Conferences

Shortly thereafter, at a routine status conference held on August 24, 2022, the court expressed frustration at the parties for the case having been pending for so long, and suddenly announced that it intended "to get [this case] off [his] report" by September 30 and set a new expedited trial schedule. Appx1722(6:1-3). At the time, fact discovery had not closed and expert discovery had not commenced. Nevertheless, the court reset the close of all discovery for September 30, 2022 and set trial to commence on November 7, 2022. Appx1744.

The court also made clear that it sought to rush this case to conclusion – no matter the means – for the sole purpose of removing this case from his Civil Justice Reform Act reporting requirements. Appx1722(6:1-4). A few exemplary comments made by the court during the status hearing include:

- "This case has gone on way, way too long." Appx1719(3:9).

- "You got all kinds of horizontal movement and no vertical movement. And I'm going to settle this case or resolve it or dismiss it by September 30th. Just – that's a head's up." Appx1719(3:14-17).

- "Forget about the claims. What are they going to do, reverse me? It goes to the Federal Circuit, doesn't it?" Appx1721(5:13-15).

- "But I have to report this case by September 30th and I'm going to get it off my report. That's the problem you have.    Did you know that?" Appx1722(6:1-3).

Two days later, the court issued an Order that reset the close of all discovery to September 30, 2022 and set trial to commence on November 7, 2022. Appx1744.

Pursuant to the court's scheduling order, Trudell timely completed its discovery obligations under the FRCP in advance of the September 30 deadline. Appx2007-2010, Appx2013-2014. In particular, Trudell disclosed all of its evidence supporting its infringement and damages contentions, including detailed expert reports from Durgin (infringement) and Mr. Ivan Hoffman (damages). *Id.* Burton, on the other hand, chose to rely only on Collins' claim construction and contention declarations (Appx281, Appx680) and did not serve expert reports under FRCP 26 by September 30, 2022. Appx2030-2031. Even the opinions in those declarations were conclusory at best.[1] *See, e.g.*, Appx751(73:18-74:22).

---

[1] Collins provided only cookie-cutter one-paragraph assertions on indefiniteness and lack of written description. Appx292-312, ¶¶39,44,49,53,58,63,68,73,77,81, 85,90,94,98,103,109. The same is true with his claim construction declaration. *See, e.g.*, Appx692(¶41), Appx711(¶111), Appx713-715(¶¶119, 124-126), Appx719-720(¶140), Appx728 (¶175). Burton ultimately did not pursue at trial any of Collins' anticipation arguments. Appx2055(23:3-4).

On October 21, 2022, after the close of all discovery (Appx1744), Burton served a new 7-page declaration from Collins to oppose Trudell's summary judgment motion on infringement. Appx1949-1955. The declaration contained 12 short paragraphs with conclusory opinions that contradicted the court's claim constructions. *Id.* For example, Collins asserted that Burton's Accused Products do not infringe because they contain a single flapper – an argument that blatantly disregarded the court's construction of "a vane" as including "one or more vanes." Appx1951(¶7), Appx32-38, Appx16-18. As a consequence of Burton's election not to timely provide an expert report from Collins on non-infringement, Trudell objected to Collins testifying at trial, and also filed a MIL to preclude Burton's witnesses from rearguing claim construction at trial. Appx1964-1968. Notably, Collins never addressed Durgin's infringement analysis on the doctrine of equivalents, whether in his post-discovery declaration or at trial. Appx1949-1954.

At a November 4, 2022 pre-trial conference, the court remained both impatient and critical of the parties' dispute, denying a routine request to provide the jury the Federal Judicial Center's patent tutorial video. Appx2054(22:2)(THE COURT: "Absolutely not."). He referred to the case as "a complete disaster" (Appx2041(9:20-21)) and admonished the parties that most of his trials were completed in one day. Appx2043(11:25). The trial judge simply did not want to be bothered by a full and fair trial of the patent claims at issue.

In the same conference, he initially reversed his own rulings on important pre-trial evidentiary matters from minutes earlier. *See, e.g.*, Appx2043(11:18-19) ( THE COURT: "Nope. I'm going to reverse what I said and deny the motion in limine"); *see also* Appx2042(10:8-22)). But, by the end of the conference, the court had granted Trudell's motion to preclude Burton's witnesses from providing testimony seeking to reargue claim construction. Appx2035(3:11-13). However, he denied Trudell's motion to preclude Collins from testifying at trial – without providing any explanation. *Id.* at 3:1-2.

On the Friday before trial, Trudell filed a motion for reconsideration of the court's decision to allow Collins to testify at trial because he had never provided any expert reports. Appx101. On Monday morning, the court reversed itself and indicated that Collins would not be permitted to testify at trial. Appx2073(2:3-12), Appx2075-2076(4:24-5:4). But, responding to protest from Burton's counsel, the court waffled and qualified that he would reconsider whether Collins would be permitted to testify at the close of Trudell's evidence. Appx2076-2080(5:8-9:2).

In summary, on the critical issue of whether Burton should be allowed to put on testimony of an expert who had not timely rendered an expert report, the court initially ruled in favor of Burton at a pretrial conference (Appx2035(3:1-2)), then reversed itself on the first day of trial (Appx2076-2080), but then qualified his ruling

by punting on the issue until after Trudell closed its case-in-chief. Appx2073-2080(2:3-9:2).

### B.  Trial

The trial, which lasted only three days, began and ended with a judge who simply was unwilling to roll up his sleeves, and try to understand the facts and the legal issues at hand. Appx1722(6:1-3), Appx1719(3:9, 3:14-17), Appx1721(5:13-15).

Trudell presented evidence from five witnesses, including its two inventors, its technical expert Durgin, a sales representative, and its damages expert Hoffman. Appx2144, Appx2227, Appx2306, Appx2411.[2] Durgin set forth a very straightforward infringement analysis that established why each and every limitation of the asserted claims was satisfied by Burton's Accused Products. *Infra* Arg.Sec.III.A.1-III.A.3; *see also* Appx2306-2356(83:1-133:10), Appx2850-2912. The court, however, failed to understand the significance of Durgin's testimony and even cut off his testimony when Durgin was about to explain how Trudell's Aerobika® device is covered by the '588 Patent. Appx2355-2356(132:13-133:10). The next, and final, day of trial, the court was unaware of the relevance of the Aerobika®, as was evident when it questioned whether the Aerobika® device was

---

[2] Trudell also called Burton's president, Mr. Gregory Lau, as an adverse witness. Appx2377.

ever seen during the trial. Appx2452-2454(12:12-14:12). After recognizing that it had prohibited testimony on the subject by Durgin a day earlier, it allowed Trudell to reopen its case-in-chief, given the confusion that resulted from the court's decision to cutoff Durgin's direct examination testimony the day before. Appx2452-2454(12:12-14:12).

Throughout Trudell's case, the court criticized Trudell and its case in front of the jury with statements that reinforced its lack of interest in this case and the technology at issue, its unfamiliarity with its own rulings, and an overall inability to maintain the appearance of justice. A few prejudicial statements from the court made in the presence of the jury include:

- THE COURT, in the presence of the jury following the re-cross of Mr. Daniel Engelbreth (Trudell's co-inventor ): "[I]t's painful. My gosh. I should have put time limits . . . so that they'd have to be efficient and get the information to you and then let you decide this week. And we have Veterans Day, which is important, and we're not going to have court on that day. . . . I don't think they understand they have to get through this case." Appx2305(82:1-8).

- THE COURT, during the direct of Durgin: "You [Trudell's counsel] can't do anything quickly. What do you [the jury] want, do you [the jury] want to hear this stuff or do you want it kept moving along in the case? . . . You're all – everybody's in favor of moving it along. Sustained." Appx2356(133:3-8).

- THE COURT, addressing the JURY during the re-direct of Durgin, while referring to a set of patent-figure related exhibits being used by Burton's counsel: "Okay. Hold on. The wheel comes from the patent itself. It – it has that illustration. I'm sitting here trying to figure out where do all these exhibits come from. So are you having the same problem? No? You all understood that, that the wheel was illustrated in the patent. Okay." Appx2473-2474(33:20-34:1).

When it came time for Burton to present its case, on the last day of trial, without any explanation or argument, the court inexplicably and suddenly decided that he would allow Collins to testify.  Appx2476-2477(36:24-37:15).  Over Trudell's objection, Burton then presented through Collins improper and never-before disclosed non-infringement opinions to the jury that conflated the issues of non-infringement and invalidity, failed to address claim language in the context of the claims, and deviated from the court's claim constructions.  Appx2508-2537(68:9-97:18).  Trudell's counsel had less than an hour, over the parties' lunch break, to prepare for a cross-examination of Collins on his new opinions presented to the jury.  Appx2357-2358(134:19-135:10).  Burton's only other witness at trial was its president, Gregory Lau.  Appx2477(37:8-13).

Against this backdrop, the court's intent to reach a verdict (any verdict) no matter the means, just so the court could remove this case from its report and send the parties off to this Court, is apparent.  *See also supra* SOC.Sec.IV.A.2.  The schedule and course of the trial raise questions regarding the legal sufficiency of the jury's ultimate verdict of non-infringement in Burton's favor.  *Id.*; *see also* Appx129-131.  Moreover, without a charge conference, the trial judge read a hodgepodge of messed-up instructions to the jury and sent them off to deliberate.[3]

---

[3] For example, the trial judge read instructions on anticipation and obviousness (Appx2598-2599(158:13-159:9)) when both defenses were dropped by Burton

Appx2591-2602(151:11-162:10).  After around two hours, and a question from the jury about the meaning of indefiniteness (Judge Boyle had neglected to include proposed jury instructions on this issue, *see* Appx106-128), the jury came back with a finding that Trudell's '588 Patent was valid, but not infringed.  Appx129-131.

## C.    Post-Trial

Trudell timely filed post-trial motions and, on March 1, 2023, the court denied Trudell's renewed motion for JMOL under FRCP 50(b) or, in the alternative, a new trial pursuant to FRCP 59(a).  Appx6-13.  Although the court acknowledged the factors that should have informed its decision about whether to exclude Collins' testimony and said they were considered, it provided no explanation whatsoever of how it analyzed those factors.  Appx12-13.  Burton did not file any post-trial motions.  Appx102-105.

## SUMMARY OF ARGUMENT

It is undisputed that Burton made a deliberate choice not to serve an expert report on non-infringement before the close of discovery.  The appropriate sanction under the Federal Rules of Civil Procedure should have been automatic exclusion of

---

during the pretrial conference, and Burton did not introduce any evidence on these issues.  Appx2055(23:3-4)("We are – we are not going to raise the anticipation or an obviousness offense [sic].").  The trial judge also read the wrong asserted claims to the jury Appx2592-2593(152:23-153:5), Appx2594(154:17-18) (referring to claims 1-18 and 20-26, when only claims 1-7, 9, and 18 were asserted during the trial) and provided a legally incorrect instruction on enhanced damages.  Appx2601-2602(161:23-162:2).

the expert's untimely and improper testimony.  Fed. R. Civ. P. 37(c)(1).  The district court abused its discretion in nonetheless allowing the expert to testify at trial in contravention of the law governing expert disclosures.  Not once did the court explain the basis for its decision to allow the expert to testify, and the trial judge's ruling on Trudell's post-trial motions did not address the relevant factors, all of which point to an opposite conclusion.  Appx12.

Had the court properly followed its gatekeeping role, no reasonable juror could have found a legally sufficient evidentiary basis to support a verdict of non-infringement in Burton's favor.  The record shows that Trudell more than met its burden to prove Burton's Accused Products infringe the asserted claims of the '588 Patent by a preponderance of the evidence.  Without the improper expert testimony, Burton presented no evidence of non-infringement at trial.  Reversal and remand for determination of damages and injunctive relief is therefore appropriate.

At a minimum, a new trial is warranted given prejudicial evidentiary errors that occurred during this jury trial.  To leave this verdict intact would result in a gross miscarriage of justice.

Finally, if the Court remands this case, Trudell respectfully submits that reassignment to a different trial judge is warranted in the interests of "minimizing even a suspicion of partiality" as required under Fourth Circuit Precedent.

# ARGUMENT

## I.    Standard of Review

Trudell appeals the court's order allowing Burton's claim construction declarant, Collins, who never timely served an expert report under FRCP 26, to testify and provide expert opinions at trial, which is reviewed under the law of the regional circuit. *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1284 (Fed. Cir. 2011). The Fourth Circuit "review[s] a district court's decision to admit expert testimony for an abuse of discretion." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 280 (4th Cir. 2021). Among other things, a "district court abuses its discretion when it misapprehends or misapplies the applicable law." *Wickersham v. Ford Motor Co.*, 997 F.3d 526, 538 (4th Cir. 2021). This Court has found that a district court abuses its discretion in a patent case when it improperly admits expert testimony contrary to the applicable federal rules. *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008) (holding the district court abused its discretion by permitting testimony from a "witness lacking the relevant technical expertise . . . under [FRE] 702").

Trudell appeals the court's denial of JMOL, which is reviewed under regional circuit law. *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012). The Fourth Circuit reviews denials *de novo*, applying the same standard as the district court. *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431

(4th Cir. 2004). JMOL denials are reversed "if the jury's factual findings, presumed or express, are not supported by substantial evidence or, if they are, that the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1547-48 (Fed. Cir. 1994); *see also Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005) ("If a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture, judgment as a matter of law must be entered.").

Trudell also appeals the court's denial of a new trial, which is reviewed under regional circuit law. *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 975 (Fed. Cir. 2022). The Fourth Circuit reviews denials for abuse of discretion. *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003). A new trial is warranted if "the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Williams v. Nichols*, 266 F.2d 389, 392-93 (4th Cir. 1959).

II.     **The District Court Abused Its Discretion By Allowing Burton's Claim Construction Declarant To Testify as an Expert Witness When He Never Served an Expert Report.**

   A.     **Collins' Testimony Should Have Been Automatically Excluded Because It Was Not Timely Disclosed under FRCP 26.**

The court abused its discretion in allowing Collins to provide expert testimony to the jury when he never timely served an expert report.   Appx2477(37:8-15), Appx2538(98:14-16, 98:23).   Fourth Circuit precedent recognizes an automatic sanction of exclusion in situations where a party's expert witness failed to comply with the requirements of FRCP 26.   *See S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 592 n.2 (4th Cir. 2003); *see also BorgWarner, Inc. v. Honeywell Int'l, Inc.*, 750 F. Supp. 2d 596, 605 (W.D.N.C. 2010) (excluding expert testimony because the report was untimely and the other side "cannot analyze the reliability of [the expert's] opinions, nor can it adequately prepare to cross-examine him or have its experts prepare any opinions in rebuttal").   Indeed, "Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses." *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278 (4th Cir. 2005). As such, "[a] party that fails to provide [timely] disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case." *Id.*

The facts here are akin to *Southco, Inc. v. Fivetech Tech. Inc.*, where the alleged infringer "did not disclose [the expert's] opinion in an expert report as

required by both the Federal Rules of Civil Procedure and the district court's scheduling order," but had submitted an expert declaration in support of its summary judgment motion on non-infringement. 611 Fed. App'x 681, 688 (Fed. Cir. 2015). The district court denied the patentee's motion to strike the expert's untimely declaration, but this Court reversed, holding that the district court "clearly erred in finding [that the patentee was not prejudiced" and " abused its discretion by failing to give [the patentee] an opportunity to depose [the expert], relying on his declaration, and then faulting [the patentee] for failing to rebut his opinion." *Id.*

The Fourth Circuit has repeatedly held that expert testimony is properly excluded absent a timely-served report. In *Wilkins v. Montgomery*, the Fourth Circuit affirmed the district court's exclusion of an expert witness because the witness disclosure "failed to provide . . . any concrete explanation of [the witness's] potential testimony" and was not made until "after the agreed-upon expert disclosure date, after discovery was closed," and after summary judgment. 751 F.3d 214, 223 (4th Cir. 2014). Similarly, in *Southern States Rack*, the Fourth Circuit held that "the district court did not abuse its discretion in excluding [expert] opinion based on Rule 37(c)(1)" where the expert presented a new opinion during trial. 318 F.3d at 599.

Against this backdrop, there is no doubt that the court abused its discretion in allowing Collins to testify. *See Southco*, 611 Fed. App'x at 688; *Wilkins*, 751 F.3d at 223; *S. States Rack*, 318 F.3d at 599. This abuse of discretion was particularly

problematic with respect to Collins' testimony regarding non-infringement – an issue in which the jury found in Burton's favor. Appx129-131. It is undisputed that Collins never provided any non-infringement expert reports before discovery closed. Appx2538(98:14-23). Collins admitted as much during trial:

> Q.    Prior to today, you never issued an expert report applying the Court's claim constructions regarding your non-infringement positions. Yes or no.
>
> . . .
>
> A.    No, I didn't.

*Id.* To the extent Burton argues that Collins' declaration in support of Burton's motion to amend its invalidity contentions (Appx280-318) and claim construction declaration (Appx1862-1923), both served in 2019, were expert reports, they do not address infringement. The two mentions of the word "infringe" in the declarations do nothing more than summarize which claims are asserted (Appx1869, ¶18) or state that Collins will later provide an "expert report in this case [that] will summarize my ultimate opinions with respect to both non-infringement and invalidity . . . ." Appx291(¶35), Appx1869-1870 (summarizing opinions). No such report was served during the discovery period.

It changes nothing that Collins provided a declaration to assist Burton in opposing summary judgment of infringement in late October 2022. Appx1949-1955. By that time, discovery had closed, trial was a mere 2.5 weeks away, and Trudell had already filed its *Daubert* motion to preclude Collins from testifying for

failure to serve an expert report. Appx1955, Appx1748-1764, Appx1744, Appx2029-2031. Moreover, despite the October 2022 declaration's vague suggestion that Collins' earlier claim construction and motion to amend declarations covered non-infringement, they did not. *Compare* Appx1949-1950(¶ ¶2,4), *with* Appx1869-1871, Appx291(¶35) (only references to "infringe[ment]").

Collins' 7-page summary judgment declaration is not the same as an expert report, which requires, *inter alia*, "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B). It contains no citations and little analysis. Appx1949-1955. Such conclusory testimony should have been excluded. *See Nease v. Ford Motor Co.*, 848 F.3d 219, 234 (4th Cir. 2017) (reversing JMOL denial because Neases' conclusory expert testimony should have been excluded and, without such testimony, Neases could not prove its case).

The fact that Collins' third declaration (Appx1949-1955) was attached to Burton's summary judgment opposition changes nothing. Courts in the Fourth Circuit have consistently rejected such reports. For example, in *Swimways Corp. v. Zuru, Inc.*, Swimways attached a declaration to its motion for summary judgment, which it alleged was a "new and improved expert report." No. 2:13-cv-334, 2014 WL 12573390, at *2 (E.D. Va. July 10, 2014). The court rejected this argument, finding that the declaration "constitute[d] new evidence that should have been

disclosed in [the witness's] initial expert report," and because the late disclosure was neither harmless nor substantially justified, exclusion was warranted. *Id.* at *2-3; *see also MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1353 (Fed. Cir. 2005) (finding a supplement to an expert report was correctly excluded where it "contained new opinions" and "was untimely, having been filed in violation of the district court's scheduling order and not being a true supplement to the initial report").

In *Akeva L.L.C. v. Mizuno Corp.*, the district court found that the witness's untimely "opinion does not constitute supplementation" because it "cannot accept a definition of supplementation which would essentially allow for unlimited bolstering of expert opinions." 212 F.R.D. 306, 310 (M.D.N.C. 2002). FRCP 26 "does not cover failures of omission because the expert did an inadequate or incomplete preparation," and "[t]o construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc [on] docket control and amount to unlimited expert opinion preparation." *Id.*

Here, Burton had the same opportunity as Trudell to prepare expert reports, and expressly stated that it would NOT do so. Appx2031 (last paragraph confirming meet and confer discussions). Burton has never offered a "substantial justification" as required by FRCP 37(c)(1) for changing course and serving an untimely new declaration. Appx3217-3222, Appx3154-3156. And for good reason. It cannot.

Collins' post-discovery declaration may have only been 7 pages, but it contained new and conclusory opinions, and failed to explain any facts or data considered by him in forming those conclusions. Appx1949-1955. The declaration does not include any cites, which made it nearly impossible for Trudell to ascertain the bases for Collins' new opinions, let alone cross-examine him on those opinions during trial. *See BorgWarner*, 750 F. Supp. 2d at 605.

Several of the opinions that Collins expressed during trial were brand new, i.e., not even presented in his late-served October 2022 declaration. These entirely new opinions included those regarding the operation of the Burton flapper valve and his analogy to an airplane (Appx2516(76:7-24)); his opinions regarding the meaning of "a vane" (Appx2524-2525(84:1-85:3)) and "translate" (Appx2525-2528(3-85:13-88:4)); operation of the accused products (Appx2513-2516(73:25-75:4, 76:7-24)); operation of embodiments illustrated in the '588 Patent (Appx2517-2528)(77:8-81:22, 82:6-85:3, 85:13-88:8, 88:12-19); and other non-infringement opinions (Appx2524-2536)(84:1-85:3, 85:13-88:4, 89:5-91:14, 91:20-22, 91:25-93:7, 3-93:20-96:13)).

**B.    Collins' Testimony Lacked Support and Should Have Been Excluded as Unreliable Under the FRE 702.**

It is well-established that the "district courts' compliance with Rule 702's plain gatekeeping requirement stems not from an arbitrary adherence to a procedural formality," but prevents the admission of "[e]xpert evidence [that] can be both

powerful and quite misleading." *Sardis*, 10 F.4th at 283 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)). Collins' testimony should have been excluded as unreliable and misleading for at least three reasons.

The first fatal flaw with the substance of Collins' testimony is his reliance on claim constructions other than those set by the court. "It is beyond dispute that claim construction issues are to be decided by the court" and that it is "improper for an expert witness to testify before the jury regarding claim construction." *ATEN Int'l Co. v. Uniclass Tech. Co.*, 932 F.3d 1364, 1370 (Fed. Cir. 2019); *see also CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) (holding expert testimony on claim construction should have been excluded "despite the agreement of the parties" because the "risk of confusing the jury is high when experts opine on claim construction before the jury"). While the *ATEN* court did not "fault the district court . . . for allowing claim construction to go to the jury" because there was no objection to the expert testimony, that is not the case here where Trudell objected several times and, in fact, sought and obtained an *in limine* ruling from the court precluding Burton's witnesses from rearguing claim construction. 932 F.3d at 1370; *see* Appx3, Appx1956(¶3). The court, however, in a rush to push this case to the finish line, failed to enforce its own rulings. Appx2526-2537(86:11-23; 97:7-10). For this reason alone, the jury's verdict of non-infringement should be vacated.

Second, Collins' testimony should also have been excluded because he improperly compared the accused products to the particular embodiments depicted in the figures in the patent specification, as opposed to the asserted claims. Appx2520-2523(80:8-83:25), Appx2528-2529(88:19-89:4), Appx2533(93:10-19). As with its earlier objections, Trudell's counsel timely objected to this line of testimony during trial, but was overruled with no explanation. (*E.g.*, Appx2521-2522(81:23-82:4 (overruling objections regarding MIL 7)) and Appx2526(86:11-23 (overruling objection regarding MIL 3)); *see also* Appx2537(97:7-10 (MIL 3)).) Such improper comparisons are additional grounds for reversal. *E.g.*, *Int'l Visual Corp. v. Crown Metal Co.*, 991 F.2d 768, 771-72 (Fed. Cir. 1993) ("Infringement is determined on the basis of the claims, not on the basis of a comparison with the patentee's commercial embodiment of the claimed invention.").

Third, even if Collins' declarations sufficed for disclosure of an expert report under FRCP 26, his opinions were conclusory and unsupported and thus failed to meet the indicia of reliability required under FRE 702. *See Nease*, 848 F.3d at 234.

"[A] district court, when faced with a party's objection, must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000). Here, the court abdicated its duty as gatekeeper, which calls for this Court to vacate the judgment of non-infringement. *See id.*; *see also Sardis*, 10

30

F.4th at 279; *Nease*, 848 F.3d at 230.  Courts across the country have overturned judgments based on less extreme circumstances.  For example, in *Goebel*, the Tenth Circuit reversed and remanded for a new trial after finding that the district court abused its discretion in admitting expert testimony over party objections when "[t]here is not a single explicit statement on the record to indicate that the district court ever conducted any form of *Daubert* analysis whatsoever."  215 F.3d at 1088; *see also* Appx2476-2477(36:25-37:15), Appx1756-1762, Appx1964-1965, Appx2521-2522(81:23-82:4), Appx2526(86:11-23), Appx2537(97:7-10).

Likewise, the Fourth Circuit has held that a district court abuses its discretion in admitting expert testimony "without engaging in the required Rule 702 analysis." *Sardis*, 10 F.4th at 279.  In *Sardis*, the defendants argued that the "experts' opinions were irrelevant because [one] offered no relevant industry standard, and [the other's] testimony was incompatible with Virginia's failure to warn jurisprudence," and "both experts' failure to test or otherwise authenticate their proximate causation opinions rendered them unreliable." *Id.*  The district court nonetheless admitted the testimony, and the Fourth Circuit reversed, finding that "[t]he district court erred at the motion *in limine* stage when it improperly abdicated its critical gatekeeping role to the jury and admitted [the experts'] testimony without engaging in the required Rule 702 analysis." *Id.*  "Had the district court faithfully executed its *Daubert*

responsibilities before or after the jury's verdict, [Fourth Circuit] precedent would have compelled it to exclude both experts' testimony." *Id.*

Against this backdrop, Fourth Circuit precedent should have compelled the exclusion of Collins' testimony. The instant abuse of discretion is even more extreme than *Sardis* because Collins never issued a written expert report. At best, Collins provided a 7-page post-discovery declaration that failed to set forth any bases or reasons for his opinions, any citations to underlying support, the facts or data considered by him in forming those opinions, or any supporting exhibits. Appx1949-1955; *see, e.g.*, *Nease*, 848 F.3d at 234 (finding that "testimony should have been excluded as it was 'unsupported by any evidence such as test data or relevant literature in the field'").

This Court should not allow Burton to capitalize on its noncompliance with the FRCP 26 and FRE 702. To the extent Burton argues that any prejudice is cured because Trudell crossed Collins on his opinions during trial, that is not true. Fourth Circuit precedent makes clear that "the ability to simply cross-examine an expert concerning a new opinion at trial is not the ability to cure." *See S. States Rack*, 318 F.3d at 598-99; *see also Southco*, 611 Fed. App'x at 688 (finding that the "district court abused its discretion by failing to give Southco an opportunity to depose Dr. Dornfeld, relying on his declaration, and then faulting Southco for failing to rebut his opinion"). Here, Trudell's counsel was forced to prepare for Collins' cross

examination in less than an hour and over the parties' lunch break. The resulting

prejudice was substantial.

**C.    The    Prejudice    to    Trudell    in    Having    Collins    Testify
Notwithstanding These Issues Was Substantial.**

Collins was Burton's only witness who testified as to non-infringement, and

his testimony was conclusory, improper, and confusing. Appx2508-2537(68:1-

97:19). Allowing Collins to testify resulted in substantial prejudice to Trudell that

warrants reversal and remand. *See Goebel*, 215 F.3d at 1088.

**1.    Without Collins' Testimony, Trudell Would Have Prevailed
In Proving Infringement.**

The prejudice to Trudell from Collins' untimely and improper testimony is

clear. Through its expert, Trudell presented limitation-by-limitation analysis as to

why Burton's Accused Products fell within the scope of the claims of the '588 Patent

as construed by the court. *Infra* Arg.Sec.III.A.1-III.A.3. The only evidence Burton

presented to counter this showing was Collins' testimony. Appx2481(41:16-24),

Appx2508-2537(68:1-97:19); *see also infra* Arg.Sec.III.A.4-III.A.5. Without

Collins' testimony, no reasonable jury could have returned a verdict of non-

infringement. *Infra* Arg.Sec.III.A.6.

The prejudice caused by Collins' trial testimony was not cured by his

deposition years earlier or cross-examination at trial. *See S. States Rack*, 318 F.3d

at 598-99; *see also Southco*, 611 Fed. App'x at 688. The only opportunity Trudell

had to depose Collins was in October 30, 2019 and was limited to the opinions he presented in his claim construction declaration. Appx742(1:20-21). This testimony was given *a year prior* to the Markman hearing held in this case, and two years before a claim construction decision issued on June 14, 2022. Appx14-22. The fact that Collins was deposed in 2019 with respect to his claim construction opinions is irrelevant to the non-infringement issues that remained following the *Markman* Order. Given the lack of an expert report or an opportunity to depose Collins on his merits opinions, Trudell's counsel was forced to cross-examine Collins on his newly-presented non-infringement opinions during trial, with less than one hour to prepare, which was unduly prejudicial. Appx2538(98:3-10); *BorgWarner*, 750 F. Supp. 2d at 605 (excluding expert testimony because the absence of a written expert report would subject the other side "to unfair surprise at trial"). Burton represented that it was not producing expert reports prior to the close of discovery, and should be held to its decision. Appx2031 (last paragraph). Collins' testimony should have been excluded, and the court erred by allowing him to testify about these previously undisclosed opinions.

> **2.    Collins' Testimony Misapplied the Court's Claim Construction And Was Prejudicial.**

It is bedrock law that parties are "prohibited from rearguing . . . claim construction or attempting to use the naked language of the claims—instead of the district court's claim construction" at trial. *Aero Prods. Int'l, Inc. v. Intex Recreation*

*Corp.*, 466 F.3d 1000, 1012 n.6 (Fed. Cir. 2006). Burton violated this prohibition multiple times over, notwithstanding the grant of Trudell's MIL 3 and objections during trial seeking adherence to the court's claim construction. Appx3, Appx1956(¶3), Appx2526(86:11-23), Appx2537(97:7-10). As evidenced by its actions leading up to, during, and following the trial, the court had little knowledge of its own claim constructions, or how they impacted the legal issues presented. Appx2451(11:3-11:18); *see supra* SOC.Sec.IV. Consequently, and to Trudell's great detriment, the jury received erroneous testimony, contrary to both the court's own claim construction, and the overwhelming weight of the evidence presented by Trudell.

The construction of disputed claim terms was first determined when the Magistrate Judge issued a reasoned and thorough 41-page M&R (Appx23-63), construing the terms at issue including, in relevant part, the following:

> "a vane": a blade or plate whose primary purpose is to convert kinetic energy in the form of fluid movement into rotational movement (Appx38 (rejecting Burton's argument that "a vane" requires more than one vane))

> "rotate relative to the opening": move a body relative to the opening about a point at a fixed radius (Appx42; *see also* Appx40 (rejecting Burton's argument "limiting the claim language to mean only a full rotation"))

> "translate relative to the opening": move a body relative to the opening in a manner in which all parts of the body move [] the same distance in the same amount of time (Appx46)

"generally oblong cross-sectional shape": cross section having a generally rectangular or elliptical shape, wherein its larger dimension is longer than its shorter dimension (Appx49)

Following Burton's objections to the M&R (Appx93), the Court overruled Burton and adopted the M&R in its entirety (Appx14-22), presumably ending all claim construction debates, and settling as law of the case the constructions to be applied at trial.   Trudell's MIL 3 (Appx1761-1762, Appx1967-1968), which the Court granted (Appx1956, Appx2035(3:11-13), Appx3), confirmed that "Burton's Witnesses Should be Precluded from Providing Testimony that Seeks to Reargue Claim Construction." Appx1956.

Yet, despite the Court's adoption of the M&R, and the grant of Trudell's MIL 3, claim construction remained amorphous due to Collins' trial testimony.  The court itself opened the door for Collins' testimony by suggesting early it placed "no value" on the magistrate judge's claim construction decision.  Appx2081(10:14-18). Burton must have perceived an opportunity when the court admitted it had limited understanding of its own claim construction of the meaning of "a" in the term "a vane":

> THE COURT: Say that again. "Any number" and "a" are mutually exclusive, aren't they? Or not?
>
> TRUDELL'S COUNSEL: No. "Any number" means one, two, three, four, five.
>
> THE COURT: All right.

TRUDELL'S COUNSEL : And also, Your Honor, just to – to remind you, in the claim construction --

THE COURT: Yeah, tell me about the claims construction. You assume I know that fluently. I don't.

TRUDELL'S COUNSEL: That's why I wanted to call something to your attention, Your Honor.

THE COURT: Okay.

TRUDELL'S COUNSEL: This -- this whole argument that a vane has to mean a single vane was made and rejected during claim construction. And so the Court interpreted the term vane and "a" means one or more in common patent parlance.

Appx2451(11:3-18) (emphasis added).

As a consequence of the court's unfamiliarity with its own claim construction, it was unable to enforce it during Burton's entire defense, particularly the testimony of Collins that was untethered to the court's claim constructions.  For example, the court construed "a vane" broadly to mean "one or more vanes" (Appx32-38), and Trudell's objected on the record to testimony in contravention of the court's grant of MIL 3.  Appx2537(97:7-18).  Nonetheless, Burton ignored the claim construction, and the court allowed Collins to wrongly and misleadingly testify that:

[T]here is no place where [the '588 Patent] talk[s] about a – a single vane. It's just not talked about at all.  Almost all the references to vanes are either a plurality of vanes or adjacent vanes.  There's one reference to vanes that say it can be any number, but that any number, as it shows examples of five, six, seven, eight.  So it clearly shows, you know, you can have eight or ten. ***It's not specific to the number, but it's got to be more than -- it's got to be more than one***.

Appx2536-2537(96:24 to 97:6) (emphasis added). Collins' testimony to the jury about "a" having to be "more than one" was squarely at odds with the court's claim construction, and was highly misleading and prejudicial. Appx32-38 (finding that "a vane" should be interpreted broadly to mean "one or more vanes").

Notwithstanding the court's claim construction that "nothing in the claim language requires a complete revolution," Collins argued the contrary to the jury, testifying that "rotate" required that the blocking segment go "round and round and round." Appx2528(88:23-24), Appx38-42, Appx18-19. Collins was repeatedly permitted to argue non-infringement on the basis that Burton's device did not perform a complete revolution in one direction:

> "indeed it [Accused Product] rotates, but as we've heard, it oscillates. It goes back and forth. And what the – what the patent teaches is that when you hit those vanes, there's a force in one direction and that causes a vane to rotate, but it rotates only in one direction. *It goes round and round and round*. . . it drives the rotation *only in one direction* versus something that oscillates back and forth" Appx2528-2529(88:13-89:4)(emphasis added); and,

> "[s]o as you read the claim, the claims protect what you're – what you're – what you're teaching the world. And for all of the – the – the claims that are related to the breath-actuated devices, *what the patent teaches is to have rotation – have a force in one direction, and that means had movement in that – in that one direction, and it goes over and over again*." Appx2533(93:7-19)(emphasis added).

Collins' testimony to the jury about "rotation" was squarely at odds with the court's claim construction, and was highly misleading and prejudicial.

38

Collins' explanation to the jury concerning the claim term "translate" was entirely misplaced. Rather than address the court's actual construction of "translate," Collins jumped into inapplicable and confusing analogies relating to a Ferris wheel and a spiraling football, which confusion was further compounded by Collins' exchange with the Court regarding a "knuckleball" baseball pitch, and whether Hoyt Wilhelm or Wilbur Wood invented that pitch. Appx2525-2528(85:13-88:8). Collins inaccurately suggested that the Accused Products "can't rotate and translate at the same time." Appx2526(86:6-9). This argument was wrong, irrelevant, misleading, and confusing to the jury. The issue was "transla[tion]," and Collins never applied the court's claim construction of that term or addressed Durgin's infringement analysis. Appx2532(92:10-15).

Here, the only testimony on non-infringement came from Collins who repeatedly relied on claim constructions other than those entered by the court. Appx2477(37:8-15), Appx2508-2537(68:1-97:19). A non-infringement verdict based on an erroneous claim construction warrants reversal. *See Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1179 (Fed. Cir. 2002). The court's abuse of discretion in permitting Collins free-rein to testify contrary to its claim constructions and untethered by a prior expert report, confused and misled the jury. This untimely and improper testimony was contrary to the clear weight of the evidence presented by Trudell and prejudiced Trudell.

**III.    The District Court Erred in Denying Trudell's Motion for Renewed JMOL With Respect to Infringement and Motion for New Trial.**

It is axiomatic that "the authority of courts of appeals to direct the entry of judgment as a matter of law extends to cases in which, on excision of testimony erroneously admitted, there remains insufficient evidence to support the jury's verdict." *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000).  Here, Burton's only evidence of non-infringement came from Collins and, as established earlier, had Collins been properly excluded, Burton would have had no other evidence of non-infringement in the record for a jury to return a verdict in its favor.  *See supra* Arg.Sec.II.

The court erred in denying Trudell's renewed JMOL motion that Burton's Accused Products infringe the asserted claims of the '588 Patent.  The court's order is replete with errors.  For instance, the Order references how "the parties presented conflicting testimony regarding what qualified as a 'vane'" during trial (Appx9), but the fact that the trial judge even allowed this "conflicting testimony" was error because Collins never timely disclosed any non-infringement opinions prior to trial. *See supra* Arg.Sec.II.  It is blackletter law that parties are not to reargue claim construction in front of the jury, *Aero*, 466 F.3d at 1012 n.6.  Indeed, the trial judge had even granted Trudell's motion *in limine* that sought to prevent this exact situation.  Appx3, Appx1956(¶3).

Trudell's expert, Durgin, provided detailed testimony about how Burton's

Accused Products satisfied all of the limitations of asserted claims 1-7, 9, and 18.

Appx2310-2354(87:8-131:20).    Burton did not substantively question any of

Durgin's infringement analysis on cross-examination nor impeach any of his

testimony.   *See infra* Arg.Sec.III.A.4.   Burton's expert, Collins, similarly did not

provide any proper basis for the jury to reject Durgin's testimony, as Collins'

testimony was untethered to from the claim language, failed to apply the court's

claim construction, failed to address Durgin's doctrine of equivalents testimony and,

to the extent it even remotely approached the subject of non-infringement, failed to

contradict any of Durgin's testimony.   *See infra* Arg.Sec.III.A.4-II.A.5.

A.    **In View of Trudell's Overwhelming Evidence of Infringement of Claims 1-7, 9, and 18, No Substantial Evidence Exists for a Reasonable Jury to Have Found Non-Infringement.**

"When an expert opinion is not supported by sufficient facts to validate it in

the eyes of the law . . . it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown*

*& Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1983).  Indeed, this Court has held

that "[c]onclusory expert testimony does not qualify as substantial evidence." *TQ*

*Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1358-59 (Fed. Cir. 2019) (collecting

cases); *see also Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 24 (Fed.

Cir. 2012) ("[G]eneral and conclusory testimony is not enough to be even substantial

evidence in support of a verdict, . . ."); *Imperium IP Holdings (Cayman), Ltd. v.*

*Samsung Elecs. Co.*, 757 Fed. App'x 974, 979 (Fed. Cir. 2019) ("[U]nder the requirement of substantial evidence, a jury's rejection of expert testimony must have some reasonable basis.").

Here, Burton failed to contradict Trudell's overwhelming evidence of infringement, and the record confirms that the jury's finding of non-infringement lacks any reasonable basis.

### 1.    The Accused Products Include All of the Limitations of Claims 1-7.

Durgin's testimony established how each of the limitations of asserted claims 1-7 were present in Burton's Accused Products.    Appx2868, Appx2889. First, Durgin testified that all of Burton's Accused Products (the vPEP®, vPEP® HC, PocketPEP®, and iPEP®) have "the same inner workings" as one another, i.e., "the same valve assembly and the same mechanism that provides the pulsations of pressure to loosen mucus in the lungs . . . ."    Appx2311(88:21-24); *see also* Appx2616-2619.  Durgin then applied the court's claim constructions (Appx2314-2316(91:25-93:4)) to explain how each of the Accused Products met each limitation of claims 1-7.  Appx2318-2334, Appx2349-2354(95:3-111:9 (claim 1); 126:6-131:9 (claims 2-7).)

With respect to independent claim 1, while the preamble was not found to be limiting, Burton admitted that its vPEP® device is a respiratory treatment device.

Appx2844; *see also* Appx2681, Appx2683, Appx2685, Appx2689, Appx2857.[4]

Durgin's testimony further confirmed that all of the Accused Products are respiratory treatment devices. Appx2318-2320(95:3-97:1).

Similarly, Durgin explained how Burton had admitted that its accused vPEP® device, and by extension all of the Accused Products, include the first three limitations of claim 1: (1) an inlet configured to receive exhaled air into the device (Appx2320-2321(97:2-98:21), Appx2844, Appx2858); (2) an outlet configured to permit air to exit the device (Appx2321-2322(98:22-99:15), Appx2844-2845, Appx2859)[5]; and "an opening positioned in an exhalation flow path defined between the inlet and the outlet" (Appx2845, Appx2322-2323(99:17-100:15), Appx2860).

With respect to the "blocking segment" limitation (fourth limitation), Durgin explained how the Accused Products contain the claimed blocking segment. Appx2861, Appx2616-2619. In doing so, he properly applied the court's construction for the term "rotate relative to the opening" (Appx2323-2324(100:17-101:24)) to explain how the blocking segment moves relative to the opening of the device about a fixed radius (Appx2324-2325(101:24-102:16)), and how the blocking segment of the accused products transitions between a closed and open position to

---

[4] Each of independent claims 9 and 18 also include the same preamble language, and are present for the same reasons. Appx158-159.

[5] Each of independent claims 9 and 18 also include these same limitations. Appx158-159.

43

create a restricted or less restricted air flow and create back pressure in the patient's lungs. Appx2323-2324(100:17-101:23). Consistent with the court's claim construction, Durgin further explained that the "blocking segment" does not require any specific degree of rotation to be satisfied and, as such, does not require a full revolution as stated by Collins. Appx2325-2326(102:17-103:10)

With respect to the limitation requiring "a vane" (fifth limitation), Durgin identified the component of the accused products that is the claimed vane (Appx2326-2328(103:18-105:22, Appx2862, Appx2616-2619)), applied the court's construction for the term "a vane" (Appx2326-2327(103:18-104:15)), and explained how the identified vane of the accused product rotates the blocking segment between the closed and open position, in accordance with the court's construction. Appx2327-2328(104:13-105:22), Appx2863. Durgin further explained how Burton's own user manuals supported his understanding as to why the identified vane satisfied the "vane" limitation as construed by the court. Appx2681, Appx2683, Appx2685, Appx2688. He also explained how Burton's own patent application directed to the flapper of the Accused Products confirms that, when operated on by pressure and air flow principles, the flapper is responsible for rotating the blocking segment between the closed and open positions. Appx2864, Appx2328-2330(105:23-107:1), Appx2658-2660(3:10-12, 3:48-51, 5:54-57, 7:62-66).

44

In addition to performing a literal infringement analysis, Durgin testified as to how this fifth limitation requiring "a vane" is present in the Accused Products under the doctrine of equivalents. Appx2330-2332(107:11-109:1), Appx2866. As discussed in further detail below, Collins did not rebut any of Durgin's doctrine of equivalents analysis with respect to this limitation. Appx2546-2547(106:21-107:1). In fact, Collins did not even mention the word "equivalent" during his direct. Appx2508-2537(68:8-97:19).

Finally, with respect to the final limitation of claim 1, Durgin testified that upon visual inspection of each of the Accused Products, the surface of the blocking segment is "substantially bigger than the size of the opening." Appx2332(109:2-22). Thus, the evidence showed the Accused Products contained every limitation of claim 1. *See* Appx2857-2868.

With respect to dependent claims 2-7, Durgin testified as to how the accused products included the structure of each of these claims. *See* Appx2349-2354(126:6-131:4).

### 2.    The Accused Products Include All of the Limitations of Claim 9.

Durgin's testimony established how each limitation of asserted claim 9 was present in Burton's Accused Products. Appx2344(121:8-15), Appx2876. Durgin testified that the preamble, first, second, and fifth limitations of claim 9 are also

found in claim 1 and, as a result, these are satisfied for the same reasons as claim 1.[6]

Appx2334-2335, Appx2344(111:10-112:4, 121:1-7).

Claim 9's third limitation recites "having a generally oblong cross-sectional shape." Appx158(12:53-54). Durgin explained how, under the court's construction, this limitation is present in the Accused Products because each has an "opening that [is] not perfectly rectangular" and "not elliptical" but "rectangular with some rounded corners," i.e., "generally rectangular or elliptical," which "fit[] perfectly into Claim Element 9.3." Appx2335-2336(112:16-113:10), Appx2870, Appx2375-2377(152:25-154:1). While Collins did attempt to rebut this particular testimony, it was through an argument about how Burton's Accused Products have a shape resembling a race track. Appx2528(88:9-11). As explained previously, this testimony was untimely and failed to apply the Court's claim construction. *See supra* Arg.Sec.II.

Claim 9's fourth limitation requires that the blocking segment's configuration "translate relative to the opening." Appx158(12:57-58). Again, applying the court's construction, Durgin testified as to how this limitation is satisfied by the Accused Products under the doctrine of equivalents because each of them satisfy the function-way-result test:

---

[6] Unlike claim 1, a finding of infringement for claim 9 does not require a finding that the Accused Products contain "a vane." *See* Appx2375(152:19-21).

- **function**: "So clearly the blocking segment of the accused device does restrict the flow of air through the opening.";

- **way**: "[S]ince the air – flow of air exiting the opening along the shortest dimension by the movement of blocking segment as required by the – by the claim element, the same thing happens in the accused product."; and

- **result**: "[T]he result is that the cross-sectional area through which the flow can take place out of the opening is reduced uniformly by the movement of the blocking segment and which – which meets the element of the claim as well")

Appx2342-2343(119:8-120:5).  Durgin alternatively explained how the Accused Products met this "translate" limitation under the insubstantial differences test. Appx2343(120:20-25) ("Q. And it's meeting – in the accused products, it's meeting the doctrine of equivalents because there's an insubstantial difference in the – the way and in the result that the accused products are accomplishing that function of restricting the flow.  A. That's correct.").  Yet again, Collins offered no rebuttal testimony to Durgin's doctrine of equivalents analysis for this limitation. Appx2545-2546(105:13-106:11).

### 3. The Accused Products Include All of the Limitations of Claim 18.

Durgin's testimony also established how each limitation of asserted claim 18 was present in Burton's Accused Products.  Appx2882, Appx2344-2348(121:20-

125:22).  Durgin testified that the preamble and first three limitations of claim 18 are also found in claim 1 and, as a result, these are satisfied for the same reasons as claim 1.  Appx2344-2345 (121:20-122:3), Appx2877.[7]

The fourth limitation of claim 18 is similar to the fourth limitation of claim 9, which both recite a blocking segment configured to "translate relative to the opening" except claim 18 lacks the additional requirement of claim 9 that the translation occur "along the shorter first dimension."  Appx2878.  Durgin testified that this limitation of claim 18 is present in the Accused Products under the doctrine of equivalents for the same reasons as claim 9.   Appx2345(122:11-13 ("So irrespective of the way the blocking segment moves, Claim 18.4 is met by the accused device under the doctrine of equivalents.")).

The fifth limitation of claim 18 is directed to how the blocking segment fits against the opening when the blocking segment is in the closed position.  Appx159(14:1-3).  Applying the court's claim construction, Durgin explained via photographic evidence how the blocking segment in each of the Accused Products mates with the respective product's opening.   Appx2345-2346(122:14-123:22), Appx2617, Appx2879.  Durgin further testified that such a mating configuration is

---

[7] Like claim 9, a finding of infringement for claim 18 does not require a finding that the Accused Products contain "a vane."  *See*  Appx2348-2349(125:26-126:5), 2375(152:22-24).

consistent with how Burton's patent describes and covers the Accused Products. Appx2346-2348(123:13-125:2), Appx2659(5:54-63), Appx2880, Appx2660(7:4-9), Appx2812-2813, Appx2820-2821.

Finally, Durgin testified that the sixth and final limitation of claim 18 was present in each of the Accused Products for the same reason as claim 1's similar, final limitation. Appx2348 (125:7-15), Appx2881.

### 4. Burton Did Not Challenge or Impeach Durgin's Infringement Analysis During Cross-Examination.

Nothing during Durgin's cross-examination rebutted his infringement analysis. Appx2356-2374(133:14-151:23). The cross-examination focused primarily on invalidity – despite Durgin not having testified on that issue during his direct examination. *E.g.*, Appx2357-2358(134:17-135:7). With respect to other issues like infringement, Burton did not challenge Durgin, but instead asked him a series of irrelevant questions that served no purpose other than to confuse the jury about claim construction. For example, with respect to claims 1-7, which require "a vane," Burton's counsel questioned Durgin as to whether "Trudell is alleging that the patent claims a single-vane device." Appx2358(135:19-20). He also asked whether "in the context of the patent, rotate relative to the opening means like a waterwheel." Appx2364(141:13-14). These questions were both resolved – in the negative – by the court's claim construction ruling. Appx38 (interpreting the term 'a vane' broadly to mean "one or more vanes"), Appx40 ("the specification here

49

should not be read as limiting the claim language to mean only a full rotation"). Such questions did nothing more than confuse the jury through inappropriate claim construction re-argument.

While Burton did question Durgin in a limited capacity about the "blocking segment" limitation, the questioning did not undermine Durgin's testimony. Appx2360-2363(137:24-140:17). Durgin was consistent in his explanation that, when the blocking segment is initially closed in the Accused Products, there is no air flow through the device, just as required by the claims. *E.g.*, Appx158(12:52-62), Appx2362(139:5-7) ("just like the valve on the side of my house that controls the water flow, if the valve is closed there is no flow"). He also explained, consistent with his direct testimony, that the air pressure building up in the device causes the blocking segment to initially open. Appx2362(139:17-18)("[t]he **air pressure** pushes against the face of the blocking segment and begins to open the valve) (emphasis added).

### 5. Collins' Conclusory, Prejudicial and Untimely Disclosed Opinions Failed to Rebut Durgin's Testimony.

Collins' rebuttal testimony, which should have been excluded, *see supra* Arg.Sec.II., did not suffice to present substantial evidence support for a verdict of non-infringement. *Brooke*, 509 U.S. at 242; *TQ Delta*, 942 F.3d at 1358; *Imperium*, 757 Fed. App'x at 979. When he actually got around to testifying about the '588 Patent's claim language, Collins argued four purported claim requirements were

missing in the Accused Products, specifically: (1) "a vane," (2) "blocking member"/"segment," (3) "translate"/"rotate," and (4) rectangular/elliptical. Appx2524-2526(84:15-86:15), Appx2528(88:9-10). Yet, his testimony about infringement was devoid of the proper context – the court's claim construction. Appx2508-2537(68:9-97:19), Appx14-63. The table below identifies those terms and claims  to which Collins' improper arguments relate.

| Term | Independent Claims |
|------|--------------------|
| a vane | 1 |
| blocking member/segment | 1, 9, 18 |
| translate/rotate | 1, 9, 18 |
| rectangular/elliptical | 9 |

Even if not untimely, Collins' testimony with respect to each of these four limitations does not suffice for a reasonable jury to find non-infringement. Appx2508-2537(68:9-97:19). As discussed previously, much of Collins' testimony about "a vane" amounted to rearguing claim construction. *See supra* Arg.Sec.II.C.2. His other testimony regarding "a vane" was comprised of general observations about airflow acting on a vane that did not amount to substantial evidence of non-infringement. Appx2524-2525(84:15-85:3), Appx2531(91:13-24). Such conclusory expert testimony is "inadequate as substantial evidence." *See TQ Delta*, 942 F.3d at 1359 n.5 (collecting cases).

Collins' testimony with respect to "blocking segment" improperly argued that the component of the Accused Products that Durgin identified as the blocking

segment was instead part of the vane.  Appx2525(85:4-12).  But the Federal Circuit has held that the same component of an accused device can meet more than one limitation.  *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1303 (Fed. Cir. 2011) (rejecting argument that "needle holder" and "retainer member" claim elements "must be separate pieces").

Collins' testimony with respect to "rotate" was flawed for at least two reasons. First, Collins impermissibly, and contrary to the court's claim construction, testified that rotate relative to an opening, as required by the language of claim 1, requires movement "only in one direction" and that the claimed blocking segment must go "round and round and round" (Appx2528(88:23-24)) – in other words, it must complete 360 degrees of rotation.  The court's construction of this term to mean "move a body relative to the opening about a point at a fixed radius" (Appx18-19) says nothing of the sort, and, in fact, its claim construction order expressly rejected the  exact argument Collins made to the jury.  Appx38-42; *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("[A] court should discount any expert testimony 'that is clearly at odds with the claim construction . . . .'").

Second, Collins' testimony on the limitation requiring "rotat[ion]" relative to an opening was conclusory.  Collins simply stated that the Accused Products did not satisfy this limitation.  Appx2533(93:7-19).  Collins never applied the court's

construction for this phrase, and entirely ignored Durgin's detailed explanation of how the Accused Products satisfy this limitation.

Collins' testimony with respect to "translate" likewise was insufficient to support the jury's verdict. First, Collins attempted to reargue claim construction by testifying that "translate relative to the opening" means "maintaining the same orientation the whole time." Appx2525-2526(85:13-86:16). This was not the court's construction. Appx46, Appx14 (adopting M&R in its entirety). Second, Collins' testimony was conclusory, and simply alleged the limitation was not present, without any explanation as to why it was missing, or any challenge to Durgin's testimony. Appx2532(92:8-15 (claim 9)), Appx2532-2533(92:23-93:3 (claim 18)).

Nor can the jury's verdict of non-infringement for claim 9 stand based on Collins' testimony that "the opening is supposed to be rectangular or elliptical." Appx2528(88:9-10). The court construed claim 9 to require a "cross section having a *generally* rectangular or elliptical shape, wherein its larger dimension is longer than its shorter dimension." Appx49 (emphasis added). Collins' testimony omits the qualifying term "generally" in an attempt to narrowly re-construe the term to strictly require a rectangular or elliptical shape. Appx2528(88:9-11). Collins' testimony based on an unduly limited re-construction of claim 9 cannot support the non-infringement verdict. *Id.*

Finally, even if the limitations requiring "a vane" (claim 1) and "a blocking segment configured to translate relative to the opening" (claims 9 and 18) were not literally present, Collins  never addressed or rebutted Durgin's doctrine of equivalents testimony with respect to each of these limitations.  Appx2546(106:16-25 (no DOE analysis for the "a vane" limitation), 106:6:11 (no DOE analysis for blocking segment configured to translate limitation).

### 6.    The Court Should Have Granted JMOL of Infringement.

Based on Durgin's detailed, unchallenged, and nonimpeached infringement testimony, and the lack of admissible evidence from Burton, Trudell moved for JMOL because no reasonable jury could have concluded that Burton's Accused Products did not infringe the '588 Patent's asserted claims.  Appx3038-3142.  In its JMOL opinion, the court stated that "the jury was not required to decrypt the record to uncover Trudell's 'strong case of infringement," and "the parties presented conflicting testimony regarding what qualified as a 'vane.'"  Appx8, Appx9(n.2).

The court erred in its reasoning.  Appx7-13.  First, the court's opinion fails to identify, what if anything needed to be decrypted –  the opinion fails to identify a single claim limitation that is missing from the Accused Products.  Appx8-9.  Second, the court was wrong to give any credence to Collins' testimony.  Appx11-13;  *see also Brooke*, 509 U.S. at 242.  Collins' testimony was unsupported by any factual analysis in a underlying expert report, repeatedly applied incorrect claim

constructions, and failed to rebut Durgin's testimony concerning infringement, especially with respect to his DOE analyses. Appx2546(106:16-25 (no DOE analysis for the "a vane" limitation), 106:6:11 (no DOE analysis for blocking segment configured to translate limitation). In view of this, insufficient evidence exists as a basis for a reasonable jury to find non-infringement. *See supra* Arg.Sec.III.A. Similarly, the court's opinion that "conflicting testimony" was presented as to what "qualified as a 'vane'" (Appx9 n.2) is wrong as Burton presented no such evidence in view of the court's construction of that term. Appx2508-2537(68:9-97:19), Appx16-18. The purported conflicting testimony is also irrelevant with respect to claims 9 and 18, which do not require "a vane." Appx158(claims 9 and 18).

Given the court's claim constructions (Appx14-63), and the unrebutted and unimpeached testimony from Durgin (Appx2306-2377(83:2-154:15)), no substantial evidence exists for a reasonable jury to have found non-infringement with respect to Burton's Accused Products. *Brooke*, 509 U.S. at 242; *TQ Delta*, 942 F.3d at 1358; *Imperium*, 757 Fed. App'x at 979.

**B.     The Court Should Order A New Trial Because Letting the Jury's Verdict of Non-Infringement Stand is Against the Clear Weight of the Evidence and Would Result in a Gross Miscarriage of Justice.**

To the extent this Court finds that JMOL on infringement is not warranted, the record establishes that the jury's verdict of non-infringement is against the clear

weight of the evidence, which at a minimum should warrant a new trial. *See Apple*,
25 F.4th at 971; *Williams*, 266 F.2d at 392-93. As explained below, none of the
reasons the court gave for denying Trudell's new trial motion has merit. Appx6-13.

> **1.** **The District Court Abused Its Discretion in Finding that the Trial Judge's Objectionable Statements Made to the Jury Did Not Result in Unfair Prejudice to Trudell.**

A new trial is warranted because the court made comments to the jury that
"actually or seemingly influence[d] a jury to forego their conscientious convictions
in order to reach a verdict when at an impasse." *See Witco Chem. Corp. v. Peachtree
Doors, Inc.*, 787 F.2d 1545, 1548 (Fed. Cir. 1986). Such "[i]mproper conduct of the
court that is prejudicial will warrant a new trial." *Id.* In *Witco*, the court recalled a
jury that had reached an impasse on infringement weeks earlier to again deliberate
on infringement. *Id.* at 1548-49. This Court vacated the verdict and ordered a new
trial because "[t]his sequence of events *seemingly* coerced the jury into reaching *a*
verdict, *any* verdict, for the sake of reaching *an* agreement, *any* agreement, in order
to end the trial." *Id.* (emphases in original). Similarly, other courts have recognized
that comments by the trial judge influencing jurors to deliberate quickly constitute
error. *E.g.*, *Lucas v. Am. Mfg. Co.*, 630 F.2d 291, 293 (5th Cir. 1980) ("find[ing]
that the attempt by the trial court to secure a quick verdict prevented fair and
thoughtful deliberation by the jury"); *Burroughs v. United States*, 365 F.2d 431, 434

(10th Cir. 1966) (entreating jury to strive toward a verdict by a certain time held reversible error).

Here, the trial judge made statements to the jury indicating his impatience to end the trial quickly, including:

- THE COURT to JURY: "But I would say we would certainly finish this week, if not sooner. . . . Juries typically serve for one to three days in this district. And the **whole purpose is to come to a resolution of it, to come to a decision**." Appx2104(33:13-23) (emphasis added).

- THE COURT to JURY: "[I]t's painful. My gosh. I should have put time limits . . . so that they'd have to be efficient and get the information to you and **then let you decide this week**. And we have Veterans Day, which is important, and we're not going to have court on that day. . . . I don't think they understand they have to get through this case." Appx2305(82:1-8) (emphasis added).

These statements by Judge Boyle served "to hurry and coerce the jury into a verdict" and constitute reversible error. *See United States v. Diamond*, 430 F.2d 688, 697 (5th Cir. 1970).

The court's post hoc explanation of its comments in its order denying Trudell's motion for a new trial do not withstand scrutiny. Appx10-11. The court defended the above comments as merely informing the jury "it expected the jury to *begin deliberation* by the end of the week." Appx10 (emphasis in original). But, as shown by the block quotes above, those were not the words the court actually used and the jury heard. Appx2104, Appx2305. The above statements were paired with other comments by the trial judge expressing exasperation at how long the trial took.

*Supra* SOC.Sec.IV.B; *see* Appx2305(82:1-8), Appx2356(133:3-8), Appx2473-2474(33:20-34:1). It also likely was not lost on the jury that the court was so rushed that it did not provide needed jury instructions. Appx106-128. Indeed, the court skipped the a promised charge conference with counsel altogether. Appx2442(2:14-18), Appx2560-2561(120:22-121:4); *see also supra* footnote 1. Against this backdrop and like *Witco*, the court's statements and actions coerced the jury into reaching a hurried verdict for purposes of "com[ing] to a resolution" by the end of the week. Appx2104(33:13-23). A new trial is warranted. *See Apple*, 25 F.4th at 971; *Williams*, 266 F.2d at 392-93.

## 2. The District Court Abused Its Discretion in Finding Collins' Testimony Admissible.

In denying Trudell's new trial motion based on Collins' improper testimony, the court stated that Trudell's "argument is flawed because the jury, not the court, determines whether an expert is *credible* and whether the expert's opinions are correct." Appx12 (emphasis added). But it is the ***admissibility*** of Collins' testimony that is at issue – not the ***credibility*** of Durgin's testimony. The fact remains that Collins should never have been allowed to testify. *See supra* Arg.Sec.II. The order provides no explanation for the court's ultimate decision to allow Collins to testify notwithstanding the untimeliness of his opinions and Burton's violations of the applicable federal rules. Appx6-13.

The court's order also attempts to justify allowing Collins' testimony on a few bases. *Id.* First, the decision points to the court's statement that it reserved ruling on the first day of trial, which purportedly "put[] Trudell on notice that Collins might testify." Appx13. The decision cites to no authority to support that two-days' notice of possible undisclosed expert testimony at trial cures the lack of a report or deposition.[8] *Id.* Trudell is aware of none.

Second, the decision suggests that Collins' summary judgment declaration sufficed as a substitute for a timely-served expert report. *Id.* But, as explained previously, that declaration was provided nearly a month after the close of discovery, Trudell had no opportunity to depose Collins, and it contained just 7 pages of barebones opinions without citations that did not suffice to put Trudell on notice of "large portions of [Collins'] testimony," which was highly technical. *Id. See also supra* Arg.Sec.II.

Finally, the court stated that Trudell had previously deposed Collins on claim construction issues and had the opportunity to cross examine him during trial. Appx13. But Trudell's earlier deposition of Collins was limited to issues raised during claim construction – not non-infringement. Appx3049 n.5. Moreover, the deposition covered only opinions presented by Collins before the court entered its

---

[8] Collins was not present at trial until the last day. Appx2080(9:5).

claim construction decision on the 10 disputed terms. *Id.* The opportunity to cross-examine Collins with less than an hour over the parties' lunch break does not cure the resulting prejudice. Appx2538(98:3-10).

## IV. This Court Should Order Reassignment on Remand.

Trudell respectfully submits that reassignment to a different trial judge is appropriate and necessary on remand. Here, reassignment is evaluated under Fourth Circuit law, which provides for reassignment where "both for the judge's sake and the appearance of justice, reassignment furthers the public interest by minimiz[ing] even a suspicion of partiality." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 726 (4th Cir. 2016), *vacated on other grounds by* 137 S. Ct. 1239 (2017); *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1343 (Fed. Cir. 2010). In determining whether reassignment is warranted, the Fourth Circuit considers three factors:

> (1) "whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected";
>
> (2) "whether reassignment is advisable to preserve the appearance of justice"; and
>
> (3) "whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness."

*Grimm*, 822 F.3d at 726; *see also Rsch. Corp. Techs. v. Microsoft Corp.*, 536 F.3d 1247, 1255 (Fed. Cir. 2008) (remanding with instructions to reassign where "the strongly expressed convictions of the trial court in this case may not be easily and objectively reconsidered"). Applying these factors, reassignment is appropriate in

this case to "minimize[] even a suspicion of partiality." *See Beach Mart, Inc. v. L&L Wings, Inc.*, 784 Fed. App'x 118, 130 (4th Cir. 2019) (alteration in original).

In a particularly analogous case, the Fourth Circuit ordered remand in *Beach Mart* and reassigned the case because the original judge had made "numerous objectionable statements" on the record, including:

- "I will find some way to terminate the case. I don't know how, but I will find a way."
- "I'm invested in closure. The law exists for only one purpose – that's finality."
- "When is a trial ever preferred to a summary judgment? Never."
- "I might just fish around in the case looking for closure and come up with it."

*Id.* (internal quotation marks omitted). The tone and suggestions to hurry the case to termination may sound familiar; the same district court judge decided this case as *Beach Mart*. Based on these statements, the Fourth Circuit concluded:

> Judge Boyle's statements indicate that he had no intention of managing a trial with respect to any claims in this case. The judge also suggested that the parties were "not going to enjoy being in this case," further undermining the appearance of fairness. Given Judge Boyle's unequivocal opposition to trying this case, we think that reassignment to another judge for trial best ensures the "appearance of justice."

*Id.*

The *Grimm* factors likewise weigh strongly in favor for reassignment if a remand is ordered here. With respect to whether the trial judge would have "substantial difficulty" in approaching the case differently, this case involves the same judge as in *Beach Mart* who made similar statement on the record to those

61

warranting reassignment in *Beach Mart.*  Those statements establish that the trial judge has zero interest in managing this case; that will not change.

With respect to the second *Grimm* factor, these same statements undermine the appearance of justice.  Indeed, the trial judge admitted to the parties:

> You know, you'll – you'll end up in the Federal Circuit and they'll flip it and who knows what'll happen.  But right now our duty is to get this case done.  And if you can't get it done, then I will.  You can get it done by settling it.  I can get it done by having a verdict in it.  Who knows?  With a jury, we might get a hung jury.  It might be, you know, nothing at all.  Anyway, I'm in the business of trials and closure.

Appx2052(20:12-19).  The judge also made clear that he had no interest in resolving the parties' dispute, but rather sought to punt the case to this Court for resolution:

> THE COURT:  Where's the Federal Circuit, in Washington, DC?
>
> TRUDELL'S COUNSEL:  That's correct, Your Honor.  And you've already told me that Washington has a problem.
>
> THE COURT:  They'll end up deciding this.

Appx2560(120:16-20).

Finally, with respect to the third *Grimm* factor, reassignment would not result in undue delay or wasted resources because the trial judge presided over the case for only 1 of the 4 years of this litigation.  Most of his involvement occurred in the last few months of that year when he rushed the parties to trial (Appx1722(6:1-4)), and made clear that he had no understanding of the legal issues involved in the dispute.  Appx2451(11:10-11).  Under these circumstances, there will be little duplication or

waste of judicial resources if the case is reassigned.  *See Beach Mart*, 784 Fed. App'x at 130.

## CONCLUSION AND RELIEF SOUGHT

In conclusion, Trudell respectfully requests that this Court reverse the court's denial of JMOL on infringement, and remand to a different trial judge for a determination of damages and injunctive relief.  To the extent the Court does not reverse, Trudell requests that the Court vacate the judgment of non-infringement and remand for a new trial with instructions that neither Collins nor any expert witness be permitted to testify on Burton's behalf.


Dated: July 20, 2023                    /s/ *William H. Frankel*
                                        William H. Frankel
                                        David P. Lindner
                                        Laura A. Lydigsen
                                        Judy K. He
                                        Crowell & Moring LLP
                                        NBC Tower, Suite 3600
                                        455 N. Cityfront Plaza Drive
                                        Chicago, Illinois 60611

                                        *Counsel for Plaintiff-Appellant,*
                                        *Trudell Medical International*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of July 2023, I caused the foregoing brief

to be electronically filed using the CM/ECF system, which will send notification of

such filing to all parties of record.


  July 20, 2023                                    /s/ *Judy K. He*
                                                   Judy K. He
                                                   Crowell & Moring LLP
                                                   NBC Tower, Suite 3600
                                                   455 N. Cityfront Plaza Drive
                                                   Chicago, Illinois 60611

                                                   *Counsel for Plaintiff-Appellant,*
                                                   *Trudell Medical International*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 27(d) and 32(g), I hereby certify that this document complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 13,758 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(a)(5). This Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally space typeface using Microsoft Word in 14-point Times New Roman font.

Dated: July 20, 2023

/s/ *Judy K. He*
Judy K. He
Crowell & Moring LLP
NBC Tower, Suite 3600
455 N. Cityfront Plaza Drive
Chicago, Illinois 60611

*Counsel for Plaintiff-Appellant,*
*Trudell Medical International*

**ADDENDUM**

# TABLE OF CONTENTS TO ADDENDUM

| Date | Description | Appx Pages |
|------|-------------|-----------:|
| 11/10/2022 | Final Judgment | Appx1-2 |
| 11/4/2022 | Oral Order on Daubert Motion and Motions in Limine | Appx3 |
| 11/7/2022 | Oral Order on Motion for Reconsideration | Appx4 |
| 11/9/2022 | Oral Order on Motion for Reconsideration | Appx5 |
| 3/1/2023 | Order re: Trudell's Renewed Motion for JMOL or, in the Alternative, a New Trial | Appx6-13 |
| 11/9/2022 | Jury Verdict | Appx129-131 |
| 11/7/2017 | U.S. Patent No. 9,808,588 | Appx132-159 |

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

| | | |
|---|---|---|
| TRUDELL MEDICAL INTERNATIONAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JUDGMENT** |
| | ) | 4:18-CV-9-BO |
| D R BURTON HEALTHCARE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Decision by Court and by Jury.**

**IT IS ORDERED, ADJUDGED AND DECREED** pursuant to this Court's order entered August 26, 2021, counter defendant Monaghan's motion to dismiss for lack of jurisdiction is GRANTED. [DE 196]. The counterclaims against counter defendant Monaghan are DISMISSED.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED,** pursuant to the jury's verdict:

•   The patent is not invalid because it failed to provide a written description of the invention that is claimed by Trudell.
•   The patent is not invalid because it failed to enable one skilled in the art to know how to make and use the invention that is claimed by Trudell.
•   The patent is not invalid because the term "vane" is indefinite.
•   The patent is not invalid because the term "rotate" is indefinite.
•   The patent is not invalid because the invention is not a workable invention.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED,** pursuant to the jury's verdict, D R Burton's vPEP product does not infringe any of the asserted claims of the patent. D R Burton's iPEP product does not infringe any of the asserted claims of the patent. D R Burton's Pocket PEP product does not infringe any of the asserted claims of the patent.

**This judgment filed and entered on November 10, 2022, and served on:**
John Morrow, Jr. (via CM/ECF Notice of Electronic Filing)
William Frankel (via CM/ECF Notice of Electronic Filing)
David Lindner (via CM/ECF Notice of Electronic Filing)
Jafron Fearson (via CM/ECF Notice of Electronic Filing)
Judy He (via CM/ECF Notice of Electronic Filing)
Madison Waller (via CM/ECF Notice of Electronic Filing)
Samuel Hartzel (via CM/ECF Notice of Electronic Filing)

Albert Allan (via CM/ECF Notice of Electronic Filing)


                                        PETER A. MOORE, JR., CLERK
November 10, 2022

                                         /s/ Lindsay Stouch
                                        By: Deputy Clerk

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### EASTERN DISTRICT OF NORTH CAROLINA

**Notice of Electronic Filing**

The following transaction was entered on 11/7/2022 at 10:32 AM EST and filed on 11/4/2022

**Case Name:**        Trudell Medical International v. D R Burton Healthcare, LLC
**Case Number:**    4:18-cv-00009-BO
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**ORAL ORDER DENYING DE [262] Plaintiffs Motion in Limine; GRANTING IN PART and DENYING IN PART DE [283] plaintiffs omnibus motion in limine. Plaintiffs motion in limine (MIL) 1 is DENIED, MIL 2 is DENIED, MIL 3 is ALLOWED, MIL 4 is ALLOWED, MIL 5 is DENIED, MIL 6 is ALLOWED, MIL 7 is DENIED, MIL 8 is DENIED, MIL 9 is DENIED, MIL 10 is DENIED, MIL 11 is DENIED; GRANTING IN PART and DENYING IN PART DE [291] as follows: (1) is DENIED; (2) is GRANTED. Part (3) of the motion was withdrawn by defendant. Entered by District Judge Terrence W. Boyle on 11/4/2022. (Stouch, L.)**

**4:18-cv-00009-BO Notice has been electronically mailed to:**

Albert P. Allan       alallan@allaniplitigation.com

John F. Morrow, Jr    John.Morrow@wbd-us.com, Karen.Angell@wbd-us.com, amy.slusher@wbd-us.com

Samuel B. Hartzell     Sam.Hartzell@wbd-us.com, Marian.Leonard@wbd-us.com, Megan.Krier@wbd-us.com

William H. Frankel     wfrankel@brinksgilson.com, wfrankel@crowell.com

David P. Lindner      dlindner@crowell.com, david-lindner-4602@ecf.pacerpro.com, federalcourts@crowell.com, lreyes@crowell.com

Jafon L. Fearson      jfearson@crowell.com

Madison B. Waller     madison.waller@wbd-us.com

Judy K. He      jhe@crowell.com

**4:18-cv-00009-BO Notice has been delivered by other means to:**

David R. Boaz
Womble Bond Dickinson (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**EASTERN DISTRICT OF NORTH CAROLINA**

**Notice of Electronic Filing**

The following transaction was entered on 11/7/2022 at : 3A7 ME  S4T and filed on 11/u/2022
**Case Name:**     Trl dell E edical \nternational . DR B HI rton , ealthcareLCC8
**Case Number:**    [- 3l: 9c. 9000079HO](#)
**Filer:**
**Document Number:** No docl ment attached

**Docket Text:**
**ORAL ORDER - The Court reserves a ruling regarding expert Collins testimony until the beginning of defendant's case. The Court has reconsideredthe motions in limine #7 and # 10 and will allow both. Entered by District Judge Terrence W. Boyle on 11/7/2022. (Stouch, L.)**

**4:18-cv-00009-BO Notice has been electronically mailed to:**

Mlbert PDMllan     alallan@allaniplitigationCom

John FDE orrowLJr     JohnE orrow@wbd9 sCom LKarenDMngell@wbd9 sCom Lamy Bll sher@wbd9 sCom

4aml el HD, artzell     4amD, artzell@wbd9 sCom LE arianDeonard@wbd9 sCom LE eganDKrier@wbd9 sCom

William , DFrankel     wfrankel@brinksgilsonCom Lwfrankel@crowellCom

Ra. id PDCindner     dlindner@crowellCom Lda. id9indner9 602@ecfbpacerproCom L federalcol rts@crowellCom Llreyes@crowellCom

Jafon CDFearson     jfearson@crowellCom

E adison HDWaller     madisonDvaller@wbd9 sCom

Jl dy KD, e     jhe@crowellCom

**4:18-cv-00009-BO Notice has been delivered by other means to:**

Ra. id BDHoaz
Womble Hond Rickinson (U4) CCP
555 Fayette. ille 4treetL4I ite 1100
BaleighLN8 2u601

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**EASTERN DISTRICT OF NORTH CAROLINA**

**Notice of Electronic Filing**

The following transaction was entered on 11/17/2722 at 17:2:3A MET and filed on 11/S/2722
**Case Name:**        Tr4dell Aedical unternational I v. D R4rton BealthcareH, , L
**Case Number:**      C018-cI-7777S-R9
**Filer:**
**Document Number:** Oo doc4N ent attached

**Docket Text:**
**ORAL ORDER regarding [301] Motion for Reconsideration. Dr. Collins will be allowed to testify for defendant. Entered by District Judge Terrence W. Boyle on 11/9/2022. (Stouch, L.)**

**4:18-cv-00009-BO Notice has been electronically mailed to:**

3lmert bv3llan    alallanP allani@litigation\coN

pohn J vAorrowHpr    pohn\AorrowP wmd-4s\coN HFaren\3ngellP wmd-4s\coN HaN K\sl4sherP wmd-4s\coN

EaN 4el RvBartyell    EaN \BartyellP wmd-4s\coN HA arianv\eonardP wmd-4s\coN HAegan\FrierP wmd-4s\coN

z illiaN Bv JranVel    wfranVelP mrinV\gilson\coN HwfranVelP crowell\coN

. al id bv, indner    dlindnerP crowell\coN Hdal id-lindner-Ck72P ecfv@acer@ov\coN H federalco4rtsP crowell\coN HlreKesP crowell\coN

pafon , vJearson    6earsonP crowell\coN

A adison Rvz aller    N adison\wallerP wmd-4s\coN

p4dK FvBe    6heP crowell\coN

**4:18-cv-00009-BO Notice has been delivered by other means to:**

. al id DvRoay
z oN mle Rond . icWnson j( EU, , b
))) J aKettel ille EtreetHE4ite 1177
DaleighHOL 25k71

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:18-CV-00009-BO

| | | |
|---|---|---|
| TRUDELL MEDICAL INTERNATIONAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| D R BURTON HEALTHCARE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on plaintiff's renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) or, in the alternative, a new trial pursuant to Fed. R. Civ. P. 59(a). [DE 313]. Defendant responded, and plaintiff replied, and the matter is ripe for disposition. For the reasons that follow, plaintiff's motion is denied.

BACKGROUND

The Court dispenses with a full recitation of the background of this case and presumes familiarity with its factual and procedural history. Trudell has a patent describing a portable respiratory device that provides oscillating positive expiratory pressure therapy to help remove excess mucus from airways. Trudell sued Burton for allegedly selling a device (the "vPep") that infringed on its patent. On November 7, 2022, a jury trial commenced in Elizabeth City, North Carolina. Trudell presented evidence, including the testimony of Dr. Durgin, who was qualified as an expert witness. Burton presented evidence, including expert witness testimony from Dr. Collins and lay testimony from Mr. Lau, the head of D R Burton Healthcare LLC. Defendant's counsel presented the jury with actual samples of the vPep to show how it differed from the patent. At the close of Burton's evidence, Trudell moved for judgment as a matter of law, which was denied. The Court held a charge conference, the parties made closing arguments, and the Court instructed the

jury on the applicable law. After deliberating for two hours, the jury returned its verdict: the patent was valid, but there was no infringement. Now, Trudell asks the Court to reverse the jury's verdict pursuant to Fed. R. Civ. P. 50(b). Alternatively, Trudell asks for a new trial pursuant to Fed. R. Civ. P. 59(a).

DISCUSSION

### I.    Judgment as a matter of law

Fed. R. Civ. P. 50(b) provides that, upon a party's renewed motion for judgment as a matter of law after the denial of such a motion during trial, a court may (1) allow judgment on the verdict, (2) order a new trial, or (3) direct the entry of judgment as a matter of law. Fed. R. Civ. P. 50(b). "[W]hen a jury has returned its verdict, a court may grant judgment as a matter of law only if, viewing the evidence in a light most favorable to the non-moving party and drawing every legitimate inference in that party's favor, the court determines that the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Saunders v. Branch Banking And Tr. Co.*, 526 F.3d 142, 147 (4th Cir. 2008) (citing *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)). A court is not permitted to weigh the evidence or evaluate the credibility of the witnesses when deciding on a Fed. R. Civ. P. 50(b) motion. *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 196 (4th Cir. 2017). "As [Trudell] bore the burden of proof on the question of literal infringement, to be entitled to judgment as a matter of law it must establish that the evidence was not only sufficient to meet this burden, but is overwhelming, leaving no room for the jury to draw significant inferences in favor of the other party." *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 165–66 (D.C. Cir. 2015); *see Precision Fabrics Grp., Inc. v. Tietex Int'l, Ltd.*, 367 F. Supp. 3d 487, 499 (D.S.C. 2019).

2

Juries in patent cases are put in a unique position given the highly complex nature of the subject matter. Some juries will understand the underlying technical claims, but many will struggle. A jury must attempt to weigh the evidence, but a jury is not unreasonable for struggling to comprehend dense technical evidence.[1] Instead, counsel must present the evidence clearly. If counsel fails to do so and the jury cannot understand the evidence, the jury may reasonably give that evidence less weight. Therefore, when the party with the burden of proof fails to present evidence clearly, a jury may reasonably return a verdict that the party failed to meet the burden of proof. *See Radtke*, 795 F.3d at 165–66.

Trudell requested a jury trial and presented the jury with a voluminous record of technical evidence. After being steeped in this case for years, this evidence may have seemed straightforward to Trudell, but the evidence was highly complicated. This jury earnestly attempted to understand the evidence, but drawing every legitimate inference in favor of the non-moving party, the Court finds that Trudell did not present the evidence clearly. Without the aid of a clear presentation, the jury was unable to comprehend such complicated evidence. And as a result, the jury did not fully understand Trudell's evidence and reasonably found Trudell had not carried its burden to prove infringement.

After meticulously citing the record, Trudell argues that "no reasonable jury could have found non-infringement from the record evidence." [DE 314 at 12]. But the jury was not required to decrypt the record to uncover Trudell's "strong case of infringement." Perhaps the raw evidence contained enough for a jury to find infringement, but all that evidence meant very little because it

---

[1] The Third Circuit has found that there are factual and legal concepts in a case that might be so complex so that any resolution by a jury would violate due process of law. *In re Japanese Elec. Prod. Antitrust Litig.*, 631 F.2d 1069, 1084 (3d Cir. 1980). However, Trudell does not raise that argument, so the Court need not consider it.

3

was not presented clearly.[2] Thus, the jury reasonably found Trudell did not carry its burden to prove infringement, and Trudell's motion for a judgment as a matter of law is without merit.

## II.    New trial

In the alternative, Trudell motions for a new trial pursuant to Fed. R. Civ. P. 59(a). A motion for a new trial must be granted where "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. & Servs., Inc. v. Crane Nat. Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996). This Court is permitted to weigh the evidence and consider the credibility of the witnesses when deciding a motion for a new trial. *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998). The decision to order a new trial is within the trial court's discretion. *Whalen v. Roanoke Cnty. Bd. of Sup'rs*, 769 F.2d 221, 226 (4th Cir. 1985).

Trudell renews its argument that the jury verdict was against the clear weight of the evidence. But the Court has already dispatched that argument. Trudell's main argument is that this Court's errors caused a miscarriage of justice, requiring a new trial. Specifically, Trudell points to the Court's statements and the admission of Dr. Collins' testimony. First, Trudell has failed to show that the alleged errors were actually errors. Second, Trudell does not connect the alleged errors with a miscarriage of justice.

## (1)  Court's statements

The Court has broad discretion to address witnesses and the jury. Trudell complains that the Court called its witness's testimony "painful" and questioned its relevance in the jury's

---

[2] The evidence was not one-sided as plaintiff suggests. During trial, the parties presented conflicting testimony regarding what qualified as a "vane." This Court will not revisit these esoteric issues but finds that defendant offered alternative ways for the jury to interpret of the evidence.

4

presence. Trudell also asserts the Court improperly "bifurcated" Trudell's case in chief by addressing the witness. The Court's statements were not error. When testimony is irrelevant, the Court may guide the witness back on track. Fed. R. Evid. 611(a)(1). Trudell cites no authority to the contrary, and even if it had, Trudell failed to show it suffered any prejudice.

In this civil case, it is within the Court's discretion to set time limits on the parties' presentation of evidence and inform the jury of the timeline. When describing the jury's expected time commitment, the Court said that it expected the jury to *begin deliberation* by the end of the week. Trudell argues the Court put undue pressure on the jury to reach a verdict when it "[told] the jury that the trial 'would certainly finish this week, if not sooner,' *i.e.*, in less than 4 days." [DE 314 at 17]. When read in context, the Court's statement was more nuanced than Trudell suggests.[3] And besides, Trudell cites no authority supporting the proposition that informing the jury how long the trial may last equates to undue pressure on the jury's deliberation. Instead, plaintiff cites *Witco Chem. Corp. v. Peachtree Doors, Inc.*, 787 F.2d 1545 (Fed. Cir. 1986), a case in which the Federal Circuit found the district court improperly dismissed a deadlocked jury only to recall them six weeks later with instructions to reach a decision. It is axiomatic that those facts are inapplicable to this case.

Trudell complains that the Court was "disinterested" and "[suggested] no interest in the relevant physics/science applicable to the technology at issue." Without logical or legal explanation, this claim deserves no further analysis. Trudell also claims the Court advised the parties of the right to "take this case up to the Federal Circuit and/or Washington D.C. for

---

[3] When referring to the parties' presentation of the evidence, the Court said, "I don't have any strong control over that. I have some control over that. But I would say we would certainly finish this week, if not sooner." [DE 315 33:15-17].

resolution." Trudell does not explain why advising the parties of their right to appeal warrants a new trial.

Trudell argues that the Court committed a procedural error when it failed to notify counsel of the exact instructions it planned to read to the jury. Again, Trudell cites no authority supporting their contention that it is entitled to a verbatim copy of the jury instructions. In the charge conference, the Court informed the parties that it would use a combination of both parties' jury instructions. Trudell may not have known the precise language the Court would read to the jury, but it fails to show this caused prejudice (such as by leading Trudell to give a closing argument that conflicted with the final instructions). In the absence of prejudice, any alleged procedural error was harmless. *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 732 (7th Cir. 2013). Trudell also argues the Court improperly instructed the jury. As of the date of this order, Trudell has not identified any specific errors that had a reasonable probability of affecting the jury's verdict.[4]

**(2) Dr. Collins's testimony**

Trudell argues it deserves a new trial because this Court erred in allowing Burton's expert witness (Dr. Collins) to testify. When a new trial is sought based on a purported evidentiary error by the district court, a verdict may be set aside only if an error is so grievous as to have rendered the entire trial unfair. *United States Equal Emp. Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017). Trudell argues that without Dr. Collins' testimony, the testimony of their expert witness (Dr. Durgin) would have been unrefuted. Therefore, no reasonable jury could have returned a verdict of non-infringement.

---

[4] Trudell identifies one allegedly erroneous instruction regarding damages, but there were no damages because there was no infringement. Therefore, that alleged error was harmless.

This argument is flawed because the jury, not the Court, determines whether an expert is credible and whether the expert's opinions are correct. *Syngenta Crop Prot., LLC v. Willowood Azoxystrobin, LLC*, 267 F. Supp. 3d 649, 655 (M.D.N.C. 2017). The opinion of an expert witness is not conclusive or binding on the factfinder, even if it is unrefuted. *Robinson v. Worley*, 540 B.R. 568 (M.D.N.C. 2015). Therefore, this jury was not required to find Dr. Durgin's testimony credible and thus was not bound to return a verdict consistent with his expert opinion.

On direct, Dr. Durgin attempted to explain infringement using highly complicated charts and figures. As discussed *supra*, it is reasonable to infer the jury found this presentation incomprehensible. The jury was free to disbelieve Dr. Durgin's testimony, particularly based on defendant's cross-examination, which highlighted some inconsistencies in his testimony. *Precision Fabrics Grp., Inc. v. Tietex Int'l, Ltd.*, 367 F. Supp. 3d 487, 499 (D.S.C. 2019). Given Dr. Durgin's esoteric testimony and the cross-examination, the jury could have reasonably given his testimony little weight. Thus, even assuming the admission of Dr. Collins's testimony was error, it was not so grievous to have rendered the entire trial unfair.

However, the admission of Dr. Collins's testimony was not error. Trudell argues Dr. Collins's testimony should have been excluded because he "never prepared any written expert report on non-infringement as required under Rule 26(a)(2)(B) and (D)." District courts are accorded "broad discretion" in determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014). In making this determination, the Court is guided by the following factors:

(1) the surprise to the party against whom the evidence would be offered;
(2) the ability of that party to cure the surprise;
(3) the extent to which allowing the evidence would disrupt the trial;
(4) the importance of the evidence; and
(5) the nondisclosing party's explanation for its failure to disclose the evidence.

7

*S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). Considering those factors, the Court reaffirms its decision to allow Dr. Collins's testimony. After hearing a motion in limine on the matter, the Court "reserve[d] a ruling on that until the end of plaintiff's case. . ." [DE 315 at 8:25-9:1]. Indeed, the Court did just that, putting Trudell on notice that Dr. Collins might testify. Dr. Collins provided a sworn declaration summarizing large portions of his testimony. Trudell had previously deposed Dr. Collins and had the opportunity to cross examine him at trial. As a result, the Court was within its discretion to allow Dr. Collins's testimony.

Trudell accuses defense counsel and various witnesses of making several statements that prejudiced the jury and entitle it to a new trial. [DE 314 at 21-22]. Without logical explanation or legal citation, Trudell's conclusory statements warrant no further analysis.

Seeing no evidence of "a miscarriage of justice," the Court denies the motion for a new trial. *Uzoukwu v. Metro. Washington Council of Governments*, No. 11-CV-00391 (CRC), 2017 WL 4712077, at *1 (D.D.C. July 11, 2017).

<u>CONCLUSION</u>

For the foregoing reasons, plaintiff's motion [DE 313] is DENIED.

SO ORDERED, this ___1___ day of March, 2023.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

8

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

_____ )
                                        )
TRUDELL MEDICAL                         )
INTERNATIONAL,                          )
                                        )
            Plaintiff,                  )
                                        ) Civil Action No. 4:18-cv-009-BO
      vs.                               )
                                        )
D R BURTON HEALTHCARE LLC,              )
                                        )
            Defendant.                  )
_____ )

## Verdict

Please answer the questions in order, and follow the instructions in order. The instructions are in italics. Your answer to each question must be unanimous.

1.    Is the patent invalid because it failed to provide a written description of the invention that is claimed by Trudell?

Yes_____                        No ____✓____

2.    Is the patent invalid because it failed to enable one skilled in the art to know how to make and use the invention that is claimed by Trudell?

Yes_____                        No ____✓____

3.    Is the patent invalid because the term "vane" is indefinite?

Yes_____                          No ____✓____


4.    Is the patent invalid because the term "rotate" is indefinite?

Yes_____                          No ____✓____


5.    Is the patent invalid because the invention is not a workable invention?

Yes_____                          No ____✓____


*If you answered "Yes" to **any** of the above questions (Questions 1-5), then stop. Do not answer any more questions. Only continue if you have answered "No" to all of the above questions. If the answer to either of Questions*


6.    Does D R Burton's vPEP product infringe any of the asserted claims of the patent?

Yes_____                          No ____✓____
If you answered "Yes," specify which claims:_____.


7.    Does D R Burton's iPEP product infringe any of the asserted claims of the patent?

Yes_____                          No ____✓____

If you answered "Yes," specify which claims:_____.

8.    Does D R Burton's PocketPEP product infringe any of the asserted claims of the patent?

Yes_____                          No ____✓____

If you answered "Yes," specify which claims:_____.

*If you answered "No" to each of the above three questions (Questions 6-8), then stop. Do not answer any more questions. Only continue if you have answered "Yes" to at least one of the above questions.*

8.    What dollar amount, if any, has Trudell proven it is entitled to recover as a reasonable royalty for the product(s) that you answered "Yes" to in Questions 6-8?          _____

9.    If you found that D R Burton infringed any of the asserted claims of the patent was that infringement malicious, wanton, deliberate, consciously wrongful, or in bad faith?

Yes_____                          No _____

_____11/9/2022_____
Date

**REDACTED VERSION**
Pursuant to the E-Government Act and the federal rules, the unredacted version of this document has been filed under seal.

(12) **United States Patent**
Meyer et al.

(10) Patent No.: **US 9,808,588 B1**
(45) Date of Patent: **Nov. 7, 2017**

(54) **OSCILLATING POSITIVE RESPIRATORY PRESSURE DEVICE**

(71) Applicant: **Trudell Medical International**, London, ON OT (CA)

(72) Inventors: **Adam Meyer**, London (CA); **Dan Engelbreth**, London (CA)

(73) Assignee: **TRUDELL MEDICAL INTERNATIONAL**, London, Ontario (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/453,767**

(22) Filed: **Mar. 8, 2017**

**Related U.S. Application Data**

(63) Continuation of application No. 13/966,759, filed on Aug. 14, 2013, now Pat. No. 9,636,473, which is a (Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *A61M 16/00* | (2006.01) |
| *A61M 16/20* | (2006.01) |
| *A61M 16/14* | (2006.01) |

(52) **U.S. Cl.**
CPC .... *A61M 16/0006* (2014.02); *A61M 16/0066* (2013.01); *A61M 16/14* (2013.01); *A61M 16/208* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 393,869 | A | 12/1888 | Warren |
| 938,808 | A | 11/1909 | Yount |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 372 148 A1 | 6/1990 |
| EP | 0 678 306 A2 | 10/1995 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 14/674,494, filed Mar. 31, 2015, Meyer et al.
(Continued)

*Primary Examiner* — Rachel Young
(74) *Attorney, Agent, or Firm* — Brinks Gilson & Lione

(57) **ABSTRACT**

An oscillating positive respiratory pressure apparatus and a method of performing oscillating positive respiratory pressure therapy. The apparatus includes a housing having an interior chamber, a chamber inlet, a chamber outlet, an exhalation flow path defined between the inlet and the outlet, and a restrictor member rotatably mounted within the interior chamber. The restrictor member has an axis of rotation that is substantially perpendicular to the flow path at the inlet, and includes at least one blocking segment. Rotation of the restrictor member moves the at least one blocking segment between an open position and a closed position. Respiratory pressure at the chamber inlet oscillates between a minimum when the at least one blocking segment is in the open position and a maximum when the at least one blocking segment is in the closed position. By exhaling into the apparatus, oscillating positive expiratory pressure therapy is administered.

**26 Claims, 18 Drawing Sheets**



# US 9,808,588 B1

Page 2

## Related U.S. Application Data

continuation of application No. 12/472,215, filed on May 26, 2009, now Pat. No. 8,539,951.

(60) Provisional application No. 61/056,358, filed on May 27, 2008.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,670,739 | A | 3/1954 | McNeill |
| 2,918,917 | A | 12/1959 | Emerson |
| 3,710,780 | A | 1/1973 | Milch |
| 3,908,987 | A | 9/1975 | Boehringer |
| 4,054,134 | A | 10/1977 | Kritzer |
| 4,062,358 | A | 12/1977 | Kritzer |
| 4,182,366 | A | 1/1980 | Boehringer |
| 4,198,969 | A | 4/1980 | Virag |
| 4,221,381 | A | 9/1980 | Ericson |
| 4,226,233 | A | 10/1980 | Kritzer |
| 4,231,375 | A | 11/1980 | Boehringer et al. |
| 4,267,832 | A | 5/1981 | Hakkinen |
| 4,275,722 | A | 6/1981 | Sorensen |
| 4,298,023 | A | 11/1981 | McGinnis |
| 4,327,740 | A | 5/1982 | Shuman |
| 4,403,616 | A | 9/1983 | King |
| 4,436,090 | A | 3/1984 | Darling |
| 4,470,412 | A | 9/1984 | Nowacki et al. |
| 4,601,465 | A | 7/1986 | Roy |
| 4,611,591 | A | 9/1986 | Inui et al. |
| 4,635,631 | A | 1/1987 | Izumi |
| 4,651,731 | A | 3/1987 | Vicenzi et al. |
| 4,739,987 | A | 4/1988 | Nicholson |
| 4,770,413 | A | 9/1988 | Green |
| 4,973,047 | A | 11/1990 | Norell |
| 4,981,295 | A | 1/1991 | Belman et al. |
| 5,018,517 | A | 5/1991 | Liardet |
| 5,042,467 | A | 8/1991 | Foley |
| 5,065,746 | A | 11/1991 | Steen |
| 5,193,529 | A | 3/1993 | Labaere |
| 5,345,930 | A | 9/1994 | Cardinal et al. |
| 5,372,128 | A * | 12/1994 | Haber ............... A61M 15/0028 |
| | | | 128/203.15 |
| 5,381,789 | A | 1/1995 | Marquardt |
| 5,451,190 | A | 9/1995 | Liardet |
| 5,479,920 | A | 1/1996 | Piper et al. |
| 5,540,220 | A | 7/1996 | Gropper et al. |
| 5,569,122 | A | 10/1996 | Cegla |
| 5,570,682 | A | 11/1996 | Johnson |
| 5,598,839 | A | 2/1997 | Niles et al. |
| 5,613,489 | A | 3/1997 | Miller |
| 5,645,049 | A | 7/1997 | Foley et al. |
| 5,647,345 | A | 7/1997 | Saul |
| 5,655,520 | A | 8/1997 | Howe |
| 5,658,221 | A | 8/1997 | Hougen |
| 5,791,339 | A | 8/1998 | Winter |
| 5,829,429 | A | 11/1998 | Hughes |
| 5,848,588 | A | 12/1998 | Foley et al. |
| 5,862,802 | A | 1/1999 | Bird |
| 5,890,998 | A | 4/1999 | Hougen |
| 5,893,361 | A | 4/1999 | Hughes |
| 5,899,832 | A | 5/1999 | Hougen |
| 5,910,071 | A | 6/1999 | Hougen |
| 5,925,831 | A | 7/1999 | Storsved |
| 6,026,807 | A | 2/2000 | Puderbaugh et al. |
| 6,044,841 | A | 4/2000 | Verdun et al. |
| 6,058,932 | A | 5/2000 | Hughes |
| 6,066,101 | A | 5/2000 | Johnson |
| 6,067,984 | A | 5/2000 | Piper |
| 6,083,141 | A | 7/2000 | Hougen |
| 6,089,105 | A | 7/2000 | Ricciardelli |
| 6,102,038 | A | 8/2000 | DeVries |
| 6,167,881 | B1 | 1/2001 | Hughes |
| 6,176,235 | B1 | 1/2001 | Benarrouch et al. |
| D440,651 | S | 4/2001 | Foran |
| 6,240,917 | B1 | 6/2001 | Andrade |

| | | | |
|---|---|---|---|
| 6,253,766 | B1 | 7/2001 | Niles |
| 6,293,279 | B1 | 9/2001 | Schmidt et al. |
| 6,340,025 | B1 | 1/2002 | Van Brunt |
| 6,345,617 | B1 | 2/2002 | Engelbreth et al. |
| 6,412,481 | B1 | 7/2002 | Bienvenu et al. |
| 6,500,095 | B1 | 12/2002 | Hougen |
| 6,557,549 | B2 | 5/2003 | Schmidt et al. |
| 6,581,595 | B1 | 6/2003 | Murdock et al. |
| 6,581,596 | B1 | 6/2003 | Truitt |
| 6,581,598 | B1 | 6/2003 | Foran et al. |
| 6,581,600 | B2 | 6/2003 | Bird |
| 6,595,203 | B1 | 7/2003 | Bird |
| 6,606,989 | B1 | 8/2003 | Brand |
| 6,607,008 | B1 * | 8/2003 | Yoshimoto ............... B06B 1/18 |
| | | | 137/624.13 |
| 6,615,831 | B1 | 9/2003 | Tuitt |
| 6,631,721 | B1 | 10/2003 | Salter et al. |
| 6,659,100 | B2 | 12/2003 | O'Rourke |
| 6,702,769 | B1 | 3/2004 | Fowler-Hawkins |
| 6,708,690 | B1 | 3/2004 | Hete et al. |
| 6,708,691 | B1 | 3/2004 | Hayek |
| 6,726,598 | B1 | 4/2004 | Jarvis |
| D490,519 | S | 5/2004 | Pelerossi et al. |
| 6,776,159 | B2 | 8/2004 | Pelerossi et al. |
| 6,848,443 | B2 | 2/2005 | Schmidt et al. |
| 6,851,425 | B2 | 2/2005 | Jaffre |
| 6,904,906 | B2 | 6/2005 | Salter |
| 6,923,181 | B2 | 8/2005 | Tuck |
| 6,929,007 | B2 | 8/2005 | Emerson |
| 6,984,214 | B2 | 1/2006 | Fowler-Hawkins |
| 7,059,324 | B2 | 6/2006 | Pelerossi et al. |
| 7,096,866 | B2 | 8/2006 | Be'eri et al. |
| 7,134,434 | B2 | 11/2006 | Truitt et al. |
| 7,165,547 | B2 | 1/2007 | Truitt et al. |
| 7,188,621 | B2 | 3/2007 | DeVries |
| 7,191,776 | B2 | 3/2007 | Niles |
| 7,191,780 | B2 | 3/2007 | Faram |
| 7,214,170 | B2 | 5/2007 | Sumners et al. |
| 7,383,740 | B2 | 6/2008 | Krasilchikov et al. |
| 7,617,821 | B2 | 11/2009 | Hughes |
| 7,699,054 | B2 | 4/2010 | Pelerossi et al. |
| 7,717,847 | B2 | 5/2010 | Smith |
| 7,771,472 | B2 | 8/2010 | Hendricksen |
| 7,779,841 | B2 | 8/2010 | Dunsmore et al. |
| 7,798,148 | B2 | 9/2010 | Doshi |
| 7,856,979 | B2 | 12/2010 | Doshi |
| 7,909,033 | B2 | 3/2011 | Faram |
| 8,006,922 | B2 | 8/2011 | Katzer |
| 8,025,051 | B2 | 9/2011 | Dagsland |
| 8,025,054 | B2 | 9/2011 | Dunsmore et al. |
| 8,043,236 | B2 | 10/2011 | Goldshtein et al. |
| 8,051,854 | B2 | 11/2011 | Faram |
| RE43,174 | E | 2/2012 | Schmidt et al. |
| 8,118,024 | B2 | 2/2012 | DeVries et al. |
| 8,118,713 | B2 | 2/2012 | Foley et al. |
| 8,225,785 | B2 | 7/2012 | Richards et al. |
| 8,327,849 | B2 | 12/2012 | Grychowski et al. |
| 8,460,223 | B2 | 6/2013 | Huster et al. |
| 8,469,029 | B2 | 6/2013 | Brown et al. |
| 8,485,179 | B1 | 7/2013 | Meyer |
| 8,539,951 | B1 | 9/2013 | Meyer et al. |
| 8,985,111 | B2 | 3/2015 | Grychowski et al. |
| D731,050 | S | 6/2015 | Meyer |
| 9,149,589 | B2 | 10/2015 | Meyer et al. |
| 9,220,855 | B2 | 12/2015 | Meyer |
| 2003/0015195 | A1 * | 1/2003 | Haaije de Boer  A61M 15/0086 |
| | | | 128/203.15 |
| 2007/0259759 | A1 | 11/2007 | Sumners et al. |
| 2008/0053456 | A1 | 3/2008 | Brown et al. |
| 2008/0078383 | A1 * | 4/2008 | Richards ............... A61M 16/08 |
| | | | 128/203.12 |
| 2009/0241949 | A1 | 10/2009 | Smutney et al. |
| 2010/0101573 | A1 | 4/2010 | Foley et al. |
| 2010/0139655 | A1 | 6/2010 | Genosar |
| 2010/0307487 | A1 | 12/2010 | Dunsmore et al. |
| 2011/0290240 | A1 | 12/2011 | Meyer et al. |
| 2012/0097164 | A1 | 4/2012 | Rozario et al. |
| 2012/0304988 | A1 | 12/2012 | Meyer |
| 2013/0133649 | A1 | 5/2013 | Grychowski et al. |

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| 2013/0184619 | A1 | 7/2013  | Von Hollen et al.   |
| 2013/0312746 | A1 | 11/2013 | Grychowski          |
| 2014/0041657 | A1 | 2/2014  | Meyer               |
| 2014/0150790 | A1 | 6/2014  | Meyer               |
| 2015/0013671 | A1 | 1/2015  | Costella et al.     |
| 2015/0053209 | A1 | 2/2015  | Meyer et al.        |
| 2015/0151060 | A1 | 6/2015  | Grychowski et al.   |
| 2015/0224269 | A1 | 8/2015  | Alizoti et al.      |
| 2015/0297848 | A1 | 10/2015 | Meyer et al.        |
| 2015/0374939 | A1 | 12/2015 | Meyer et al.        |
| 2016/0136369 | A1 | 5/2016  | Meyer et al.        |
| 2016/0310695 | A1 | 10/2016 | Meyer et al.        |
| 2017/0028161 | A1 | 2/2017  | Meyer et al.        |
| 2017/0049979 | A1 | 2/2017  | Meyer et al.        |

FOREIGN PATENT DOCUMENTS

| EP | 1435251          |    | 12/2003 |
| EP | 1 464 357        | A1 | 10/2004 |
| EP | 1 435 251        | B1 | 6/2006  |
| EP | 1 103 287        | B1 | 6/2007  |
| EP | 1 897 576        | A1 | 3/2008  |
| EP | 1 908 489        | A1 | 4/2008  |
| EP | 2444114          |    | 4/2012  |
| EP | 2455137          |    | 5/2012  |
| GB | 2 425 488        | A  | 11/2006 |
| WO | WO 89/03707      | A1 | 5/1989  |
| WO | WO 96/40376      |    | 12/1996 |
| WO | WO 99/16490      |    | 4/1999  |
| WO | WO 00/27455      |    | 5/2000  |
| WO | WO 2007/061648   | A3 | 5/2007  |
| WO | WO 2007/119104   | A3 | 10/2007 |
| WO | WO 2008/063966   | A1 | 5/2008  |
| WO | WO 2008/122045   | A1 | 10/2008 |
| WO | WO 2009/131965   |    | 10/2009 |
| WO | WO 2011/058470   |    | 5/2011  |
| WO | WO 2012/038864   | A2 | 3/2012  |
| WO | WO 2016/012740   |    | 1/2016  |

OTHER PUBLICATIONS

U.S. Appl. No. 29/524,678, filed Apr. 22, 2015, Meyer et al.
U.S. Appl. No. 29/538,317, filed Sep. 2, 2015, Engelbreth et al.
U.S. Appl. No. 29/538,323, filed Sep. 2, 2015, Engelbreth et al.
U.S. Appl. No. 15/415,524, filed Jan. 25, 2017, Meyer et al.
Web page entitled Bronchial Hygiene, acapella Vibratory PEP Therapy System accessed from http://www.smiths-medical.com/catalog/bronchial-hygiene/acapella/acapella.html on Jul. 7, 2009.
Web page entitled Thayer Quake accessed from http://www.thayermedical.com/quake.htm on Jul. 7, 2009.
Human growth hormone, cortisol, and acid-base balance changes after hyperventilation and breath-holding; PubMed—indexed for MEDLINE; Int J Sports Med., Dec. 7, 1986; 7(6):311-5, Djarova T. Bosco C, Cardinale M. & Tsarpela O (1999). Influence of vibration on mechanical power and electromyogram activity in human arm flexor muscles. Eur J Appl Physiol 79, 306-311.
David Sumners; Power Breathing and Strength; http://EzineArticles.com/972576 Published: Feb. 7, 2008.
Good Vibrations blog; http://vibrotraining.blogspot.com, Earliest posting Jan. 18, 2008.
Breathtaking News; More Youbreathe; Aug. 10, 2007.
PCT International Search Report for PCT/IB2012/001089, dated Oct. 5, 2012.
PCT International Written Opinion for PCT/IB2012/001089, dated Oct. 5, 2012.

* cited by examiner



*FIG. 1*



## FIG. 2



**FIG. 3**



*FIG. 4*



FIG. 5A          FIG. 5B          FIG. 5C

FIG. 5D          FIG. 5E

Appx139



*FIG. 6*



*FIG. 7*



FIG. 8



*FIG. 9*



*FIG. 10*



## FIG. 11



*FIG. 12*



*FIG. 13*



## FIG. 14



*FIG. 15*



*FIG. 16A*          *FIG. 16B*          *FIG. 16C*

*FIG. 17*



## FIG. 18

US 9,808,588 B1

1

# OSCILLATING POSITIVE RESPIRATORY PRESSURE DEVICE

## RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 13/966,759, filed on Aug. 14, 2013, pending, which is a continuation of U.S. application Ser. No. 12/472,215, filed on May 26, 2009, now U.S. Pat. No. 8,539,951, which claims the benefit of U.S. Provisional Application No. 61/056,358, filed on May 27, 2008, all of which are incorporated herein by reference.

## TECHNICAL FIELD

The present disclosure relates to a respiratory treatment device, and in particular, to an oscillating positive respiratory pressure device.

## BACKGROUND

Each day, humans may produce upwards of 30 milliliters of sputum, which is a type of bronchial secretion. Normally, an effective cough is sufficient to loosen secretions and clear them from the body's airways. However, for individuals suffering from more significant bronchial obstructions, such as collapsed airways, a single cough may be insufficient to clear the obstructions.

One type of therapy, utilizing oscillating positive expiratory pressure ("OPEP"), is often used to address this issue. OPEP therapy represents an effective bronchial hygiene technique for the removal of bronchial secretions in the human body and is an important aspect in the treatment and continuing care of patients with bronchial obstructions, such as those suffering from chronic obstructive lung disease. It is believed that OPEP therapy, or the oscillation of exhalation pressure at the mouth during exhalation, effectively transmits an oscillating back pressure to the lungs, thereby splitting open obstructed airways and loosening the secretions contributing to bronchial obstructions.

OPEP therapy is an attractive form of treatment because it can be easily taught to most hospitalized patients, and such patients can assume responsibility for the administration of OPEP therapy throughout their hospitalization and also once they have returned home. To that end, a number of portable OPEP devices have been developed.

## BRIEF SUMMARY

A portable OPEP device and a method of performing OPEP therapy are described herein. The OPEP device is configurable to maintain desired operating conditions. A user may adjust the oscillation frequency by simply replacing a component of the OPEP device, or by changing the speed at which that component rotates. Furthermore, administration of OPEP therapy with the device does not rely on the device's physical orientation or the ability of its user to manipulate the device during operation.

In one aspect, the OPEP device comprises a housing having an interior chamber, a chamber inlet in communication with the chamber, a chamber outlet in communication with the chamber, an exhalation flow path defined between the inlet and the outlet, and a restrictor member rotatably mounted within the interior chamber. The restrictor member has an axis of rotation substantially perpendicular to the exhalation flow path at the inlet, and includes at least one blocking segment. The restrictor member may be movable

with respect to the inlet such that rotation of the restrictor member moves the at least one blocking segment between an open position where the flow path at the inlet is unrestricted and a closed position where the flow path at the inlet is restricted. The respiratory pressure at the chamber inlet oscillates between a minimum when the at least one blocking segment is in the open position and a maximum when the at least one blocking segment is in the closed position.

In another aspect, the OPEP device comprises a shaft connecting a source of rotational energy to the restrictor member. The source of rotational energy may also comprise a motor adapted to rotate the shaft.

In another aspect, the OPEP device includes a second restrictor member rotatably mounted within the interior chamber and operatively connected to the shaft, the second restrictor member having a at least one blocking segment. The shaft is moveable along its axis of rotation to position the second restrictor member with respect to the inlet such that rotation of the shaft moves the at least one blocking segment on the second restrictor member between the open position and the closed position. A number of blocking segments on the restrictor member and a number of blocking segments on the second restrictor member may be different.

In another aspect, the source of rotational energy comprises a turbine operatively connected to the restrictor member and adapted to rotate the restrictor member in response to receiving a flow of air. The OPEP device may also comprise a turbine housing surrounding the turbine, the turbine housing having a compressed air inlet configured to receive compressed air from a compressed air source and an exhaust outlet.

In yet another aspect, the OPEP device may be configured to simultaneously administer both OPEP and aerosol therapies. The OPEP device may include a respiratory portal in fluid communication with the inlet, the respiratory portal including a mouthpiece and a nebulizer port. The mouthpiece may be proximate the nebulizer port. An inhalation flow path is defined between the mouthpiece and the nebulizer port, wherein the inhalation flow path does not traverse the exhalation flow path defined between the inlet and the outlet.

In another aspect, the restrictor member is configured to rotate in response to exhaled air traversing the exhalation flow path. The at least one blocking segment is configured to move between the open position and the closed position independent of the exhalation pressure at the inlet. The restrictor member may also be removably mounted within the interior chamber.

In one embodiment, an OPEP device includes a housing having an interior chamber, a chamber inlet in communication with the chamber, a chamber outlet in communication with the chamber, an exhalation flow path defined between the inlet and the outlet, and a restrictor member rotatably mounted within the interior chamber, the restrictor member having at least one blocking segment and a plurality of vanes configured to rotate the restrictor member in response to exhaled air traversing the flow path. The restrictor member is positioned with respect to one of the inlet or the outlet such that rotation of the restrictor member moves the at least one blocking segment between an open position, where the exhalation flow path at the one of the inlet or the outlet is unrestricted, and a closed position, where the flow path at the one of the inlet or the outlet is restricted. The exhalation pressure at the chamber inlet oscillates between a minimum when the at least one blocking segment is in the open position and a maximum when the at least one blocking segment is in the closed position. The at least one blocking

US 9,808,588 B1

**3**

segment may have a cross-sectional area greater than a cross-sectional area of the one of the inlet or the outlet. The housing may include a one-way valve configured to allow air to enter the interior chamber through a valve opening. A center of gravity of the restrictor member may be radially offset from the axis of rotation of the restrictor member. The restrictor member may also be removably mounted within the interior chamber.

According to another aspect, a method of performing oscillating positive respiratory pressure therapy is provided. The method includes providing an oscillating positive respiratory pressure apparatus, which may consist of a housing defining an interior chamber, a chamber inlet in communication with the chamber, a chamber outlet in communication with the chamber, an exhalation flow path defined between the inlet and the outlet, and a restrictor member having at least one blocking segment and a plurality of vanes. The restrictor member is rotatably mounted in the interior chamber and positioned such that rotation of the restrictor member moves the at least one blocking segment between an open position where the exhalation flow path at one of the inlet or the outlet is unrestricted and a closed position where the exhalation flow path at the one of the inlet or outlet is restricted. The method may include receiving exhaled air through the inlet, rotating the restrictor member in response to receipt of the exhaled air at the plurality of vanes, and oscillating an exhalation pressure between a minimum and a maximum at the inlet during an exhalation period. The minimum may be achieved when the restrictor member is in the open position and the maximum may be achieved when the restrictor member is in the closed position. The restrictor member may be configured to move between the open position and the closed position independent of the exhalation pressure at the chamber inlet.

In yet another embodiment, a system for providing oscillating respiratory pressure therapy in combination with aerosol therapy is provided. The system may include an oscillating positive respiratory pressure apparatus having a housing defining a chamber, a chamber inlet in communication with the chamber, and a chamber outlet in communication with the chamber. An exhalation flow path is defined between the chamber inlet and the chamber outlet. A restrictor member having at least one blocking segment and a plurality of vanes is rotatably mounted in the interior chamber and positioned such that rotation of the restrictor member moves the at least one blocking segment between an open position where the exhalation flow path at one of the chamber inlet or the chamber outlet is unrestricted and a closed position where the exhalation flow path at the one of the chamber inlet or the chamber outlet is restricted. Also, a respiratory portal is adapted for receiving an aerosol medicament. The system may further include an aerosol therapy apparatus removably connected to the respiratory portal of the oscillating positive respiratory pressure apparatus. The aerosol therapy apparatus may consist of an aerosol housing having an aerosol chamber for holding an aerosol medicament and an aerosol outlet communicating with the aerosol chamber for permitting the aerosol medicament to be withdrawn from the aerosol chamber. The system may also have an inhalation flow path defined between the aerosol outlet and a user interface, where the inhalation flow path does not traverse the exhalation flow path defined between the chamber inlet and the chamber outlet. The aerosol medicament traverses the inhalation flow path without contacting the restrictor member.

**4**

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a perspective view of a first embodiment of an OPEP device with a side portion of the device's housing removed;

FIG. **2** is a perspective view of the embodiment of FIG. **1** with a top portion of the device's housing removed, showing a restrictor member in an open position;

FIG. **3** is a perspective view of the embodiment of FIG. **1** with a top portion of the device's housing removed, showing a restrictor member in an intermediate position;

FIG. **4** is a perspective view of the embodiment of FIG. **1** with a top portion of the device's housing removed, showing a restrictor member in a closed position;

FIGS. **5**A-E are top views of various restrictor members;

FIG. **6** is a perspective view of a second embodiment of an OPEP device with a side portion of the device's housing removed;

FIG. **7** is a perspective view of a third embodiment of an OPEP device attached to a nebulizer;

FIG. **8** is a cross-sectional side view of the embodiment of FIG. **7**;

FIG. **9** is a perspective view of a fourth embodiment of an OPEP device with a top portion of the device's housing removed;

FIG. **10** is a bottom view of the embodiment of FIG. **9** with a bottom portion of the device's housing removed;

FIG. **11** is a cross-sectional perspective view of the embodiment of FIG. **9**;

FIG. **12** is a cross-sectional perspective view of a fifth embodiment of an OPEP device;

FIG. **13** is a cross-sectional side view of the embodiment of FIG. **12** showing a restrictor member in a closed position;

FIG. **14** is a cross-sectional side view of the embodiment of FIG. **12** showing a restrictor member in an open position;

FIG. **15** is a cross-sectional perspective view of the embodiment of FIG. **12** having a one way-valve;

FIGS. **16**A-C are top views of various restrictor members suitable for use in the embodiment of FIG. **12**;

FIG. **17** is a cross-sectional perspective view of a sixth embodiment of an OPEP device; and,

FIG. **18** is a cross-sectional perspective view of the embodiment of FIG. **17** attached to a nebulizer.

DETAILED DESCRIPTION OF THE
PRESENTLY PREFERRED EMBODIMENTS

OPEP therapy is very effective within a specific range of operating conditions. For example, an adult human may have an exhalation flow rate ranging from 10 to 60 liters per minute, and may maintain a static exhalation pressure in the range of 10 to 20 cm $H_2O$. Within these parameters, OPEP therapy is believed to be most effective when changes in the exhalation pressure range from 5 to 20 cm $H_2O$ oscillating at a frequency of 10 to 40 Hz. In contrast, an infant may have a much lower exhalation flow rate, and may maintain a lower static exhalation pressure, thereby altering the operating conditions most effective for OPEP therapy. As described below, the present invention is configurable so that ideal operating conditions may be selected and maintained.

Referring to FIG. **1**, a first embodiment of an OPEP device **130** is shown with a side portion of a housing **132** removed for purposes of illustration. In general, the OPEP device **130** comprises a housing **132** having an interior chamber **134**, a chamber inlet **136**, and a chamber outlet **138**. An exhalation flow path **140** is defined through chamber inlet **136**, the interior chamber **134**, and the chamber outlet

US 9,808,588 B1

5

**138**. The housing **132** may also be associated with a mouth-piece **139** for receiving exhaled air. Although the mouth-piece **139** is shown in FIG. **1**. as being fixedly attached to the housing **132**, it is envisioned that the mouthpiece **139** may be removable and replaceable with a mouthpiece **139** of a different shape or size. Alternatively, other user interfaces, such as breathing tubes or gas masks (not shown) may be associated with the housing **132**. Preferably, the housing **132** is openable so that the interior chamber **134** and the parts contained therein can be periodically accessed, cleaned, and replaced. The housing **132** may be constructed of any durable material, such as a plastic or polymer.

In FIG. **1**, the housing **132** and the interior chamber **134** are cylindrical. However, a housing of any shape could be used. Furthermore, the chamber inlet **136** is generally shown as being a single, rectangular inlet. However, the chamber inlet **136** could also be any shape or series of shapes, such as a plurality of circular inlets. More importantly, it should be appreciated that the cross-sectional area of the chamber inlet **136** influences the ideal operating conditions discussed above. Likewise, the chamber outlet **138** is generally shown as a plurality of apertures, however a single aperture or a number of arrangements of apertures may also be used. Although these variables are discussed in general with reference to the embodiment of FIG. **1**, it should be under-stood that every embodiment described herein may be varied in a similar manner.

A restrictor member **142** is rotatably mounted within the interior chamber **134**. The restrictor member **142** may also be constructed of any durable plastic or polymer, such as polypropylene. As shown in FIG. **1**, the restrictor member **142** comprises a hub portion **144** and at least one blocking segment **146** extending outward from the hub portion **144**. The restrictor member **142**, however, could be any number of shapes, so long as it may be positionable such that at least one blocking segment **146** located on the restrictor member **142** is capable of at least partially blocking the chamber inlet **136**, as described below.

The restrictor member **142** is connected at the hub portion **144** to a shaft **148**, such that rotation of the shaft **148** causes rotation of the restrictor member **142**. The shaft **148** extends through the housing **132** and may be operatively connected to a motor **150**. The motor **150**, along with batteries (not shown) for powering the motor **150**, may be housed within a motor housing (not shown) attached to the OPEP device **130**. Although it is preferred that the shaft **148** be adapted for connection to a motor **150**, it is also envisioned that the shaft **148** could extend through the housing **132** and be adapted for manual rotation by the user of the OPEP device **130**.

Referring to FIGS. **2-4**, the OPEP device **130** is shown with a top portion of the housing **132** removed for purposes of illustration. In FIG. **2**, the OPEP device **130** is shown with the restrictor member **142** and the chamber inlet **136** arranged in an open position. The restrictor member **142** is positioned in an open position when no blocking segment **146** is substantially blocking the chamber inlet **136** and when the flow path **140** through the cross-sectional area of the chamber inlet **136** is substantially unrestricted by the restrictor member **142**. Thus, when the restrictor member **142** is in an open position, a user of the OPEP device **130** may freely exhale into the mouthpiece **139** and the exhaled air may travel along the exhalation flow path **140** through the chamber inlet **136**, into the interior chamber **134**, and out the chamber outlet **138**. In the open position, the exhalation pressure at the chamber inlet **136** is at a minimum.

Referring to FIG. **3**, the restrictor member **142** is shown in an intermediate position. The restrictor member **142**

6

moves to an intermediate position when the restrictor mem-ber **142** is rotated to a position where a blocking segment **146** is at least partially blocking the chamber inlet **136** and the flow path **140** through the cross-sectional area of the chamber inlet **136** is at least partially restricted by the restrictor member **142**. As a user exhales into the mouth-piece when the restrictor member **142** is in an intermediate position, the exhaled air passes through the unblocked portion of the flow path **140** and exits the interior chamber **134** through the chamber outlet **138**. If the restrictor member **142** is in an intermediate position moving to an open position (FIG. **2**), then the exhalation pressure at the cham-ber inlet **136** is decreasing. If the restrictor member **142** is moving to a closed position, the exhalation pressure at the chamber inlet **136** is increasing.

Referring to FIG. **4**, the restrictor member **142** is shown in a closed position. The restrictor member **142** moves to a closed position when the restrictor member **142** is rotated to a position where a blocking segment **146** substantially blocks the chamber inlet **136** and the flow path **140** through the cross-sectional area of the chamber inlet **136** is substan-tially restricted by the restrictor member **142**. Thus, when the restrictor member **142** is in a closed position, substan-tially no exhaled air passes through the chamber inlet **136**. It should be understood that a complete seal need not be formed at the chamber inlet **136** between the restrictor member **142** and the housing **132**. A small amount of exhaled air may be permitted to pass through the chamber inlet **136** when the restrictor member is in the closed position. Nevertheless, in the closed position, exhalation pressure at the chamber inlet **136** is at a maximum.

When the OPEP device **130** is in operation and the shaft **148** is continuously rotated, the restrictor member **142** moves between an open position, multiple intermediate positions, a closed position, multiple intermediate positions, and back to an open position. Likewise, the cross-sectional area of the flow path **140** through the chamber inlet **136** transitions from being substantially unrestricted, to substan-tially restricted, and back to being substantially restricted. As a result, when the user exhales into the mouthpiece **139**, the exhalation pressure at the chamber inlet **136** increases to a maximum as the restrictor member **142** moves from an open position to a closed position and decreases to a minimum as the restrictor member **142** returns to an open position. As the restrictor member **142** continues to rotate and periodically restrict the flow path **140** through the chamber inlet **136**, the exhalation pressure at the chamber inlet **136** oscillates between a minimum when the restrictor member **142** is in an open position and a maximum when the restrictor member **142** is in a closed position. This oscillat-ing exhalation pressure effectively transmits an oscillating back pressure to the lungs, thereby splitting open obstructed airways, and loosening the secretions contributing to bron-chial obstructions.

As previously stated, the housing **130** is preferably open-able so that the restrictor member **142** may be accessed. The restrictor member **142** is removably connected to the shaft **148** such that a user can remove the restrictor member **142** for cleaning or replacement with a new or different restrictor member **142**. Referring to FIGS. **5A-E**, top views of mul-tiple restrictor members **142** are shown. The hub portion **144** of each restrictor member **142** has a slot **145** keyed to fit on a corresponding keyed portion (not shown) of the shaft **148**. In this regard, a user is able to easily remove an existing restrictor member **142** for cleaning or replacement with a new restrictor member **142**.

US 9,808,588 B1

7

Depending on the prescribed treatment, a user may select from a number of restrictor members **142**, each having a different number of blocking segments **146**. FIGS. **5**A-E show an eight blocking segment **146** restrictor member **142** and multiple alternative restrictor members **142**a, **142**b, **142**c, **142**d, having anywhere from four to seven blocking segments **146**. By changing the number of blocking segments **146** on the restrictor member **142**, the user may change the oscillation frequency of the exhalation pressure generated at the chamber inlet **136** for a given rotation speed of the motor **150**. Furthermore, the relative size or shape of the blocking segments **146** on a restrictor member **146** may vary, thus providing for added variation in the oscillation, if desired.

In addition, the motor **150** may be a variable speed motor controllable by the user. Although the motor may be configured to rotate the restrictor member back and forth in opposite directions, the restrictor member **142** is preferably only rotated in a single direction. By adjusting the rotational speed of the motor **150**, a user may also adjust the oscillation frequency of the exhalation pressure generated at the chamber inlet **136**. This combination of different restrictor members **142** and the variable speed motor **150** provides for a highly configurable OPEP device **130**.

Referring to FIG. **6**, a second embodiment of an OPEP device **230** is shown with a side portion of a housing **232** removed for purposes of illustration. In general, the OPEP device **230** has a larger housing **232** for accommodating multiple restrictor members **242**. The housing **232** also has an interior chamber **234**, a chamber inlet **236**, and a chamber outlet **238**. A flow path **240** is defined through the chamber inlet **236**, the interior chamber **234**, and exiting the chamber outlet **238**.

Within the interior chamber **234**, the restrictor members **242** may either be stacked atop one another and operatively connected to a shaft **248**, or, in the alternative, each restrictor member **242** may have a different number of blocking segments **246**. As in the prior embodiment, the housing **232** is openable so that a user may remove and replace the restrictor member **242** positioned adjacent the chamber inlet **236**. Thus, the interior chamber **232** may conveniently store multiple restrictor members **242** from which the user may choose to position on the shaft **248** adjacent the chamber inlet **236**.

Alternatively, the shaft **248** may be moveable along its axis of rotation so that a user may position a different restrictor member **242** adjacent the chamber inlet **236** simply by sliding the shaft further in or out of the housing **232**. Therefore, a user can adjust the oscillation frequency without opening the housing **232** and replacing the restrictor member **242** positioned adjacent the chamber inlet **236**, and without adjusting the rotational velocity of the shaft **248**.

Referring to FIGS. **7**-**8**, a third embodiment of an OPEP device **330** is shown. As shown in FIG. **7**, the OPEP device **330** is adapted to connect to an output **360** of a nebulizer **352** for the simultaneous administration of OPEP and aerosol therapies. The OPEP device **330** generally includes a respiratory portal **354** for fluidly interconnecting the nebulizer **352**, a mouthpiece **339**, and the OPEP housing **332**. The OPEP device **330** may be configured such that it can be used either in combination with the nebulizer **352** or solely for administration of OPEP therapy. FIG. **7** also illustrates a motor housing **356** for housing a motor (not shown) and batteries (not shown) for supplying power to the motor. A shaft **348** is provided to transfer rotational motion from the motor to the restrictor member **342**.

8

Referring to FIG. **8**, a side view of the respiratory portal **354** is shown without the nebulizer **352** for delivery of OPEP therapy only. In FIG. **8**, the chamber inlet **336** is located above the interior chamber **334** and the chamber outlet **338** is located directly beneath the mouthpiece **339**. However, it should be noted that the chamber inlet **336** and the chamber outlet **338** may be located elsewhere on the housing **332**, as discussed in reference to the previous embodiments.

The respiratory portal **354** includes a nebulizer port **356** adapted for receiving either the nebulizer output **360** or an end cap **358** for regulating the flow of air through the nebulizer port **356**. The end cap **358** and the nebulizer output **360** may be removably connected to the nebulizer port **356** by any means, including threaded or snap-on connections. Both the nebulizer output **360** and the end cap **358** may include a one-way valve **359** configured so that air may enter the respiratory portal **354** through the valve opening **361** on inhalation, but block the flow of air out of the valve opening **361** upon exhalation. Likewise, the chamber inlet **336** may include a one way valve (not shown) configured so that air may enter the interior chamber **334** through the chamber inlet **336** on exhalation, but be prevented from flowing out of the interior chamber **334** upon inhalation.

Thus, when a user of the OPEP device **330** exhales into the mouthpiece **339**, the one way valve in the end cap **358** or nebulizer output **360** closes, the one way valve through the chamber inlet **336** opens, and exhaled air is forced into the interior chamber **334** through the chamber inlet **336**. In contrast, when a user of the OPEP device **330** inhales air through the mouthpiece **339**, the one way valve in the end cap **358** or nebulizer output **360** opens, the one-way valve through the chamber inlet **336** closes, and air is drawn through the nebulizer port **356** into the user's mouth. If the nebulizer **352** is attached, a user inhales medicated air drawn from the nebulizer **352** upon inhalation. Any of a number of commercially available nebulizers may be used. One suitable nebulizer is the AeroEclipse® II breath actuated nebulizer available from Trudell Medical International of London, Canada. Descriptions of suitable nebulizers may be found in U.S. Pat. No. 5,823,179, the entirety of which is hereby incorporated by reference herein.

As in the previously discussed embodiments, the OPEP device **330** administers OPEP therapy to the user during an exhalation period. As a user exhales into the mouthpiece **339**, exhaled air is forced through the chamber inlet **336** and into the interior chamber **334**. During exhalation, as the restrictor member **342** rotates, and as the blocking segments **346** pass by the chamber inlet **336**, the exhalation pressure at the chamber inlet **336** oscillates between a minimum when the restrictor member **342** is an open position and a maximum when the restrictor member **342** is in a closed position.

Alternatively, the OPEP device **330** may also be configured to administer oscillating pressure therapy to the user during both inhalation and exhalation. If the end cap **358** is provided without a one-way valve, inhaled air is drawn from the interior chamber **334** through the chamber inlet **336**. In such a configuration, as the restrictor member **342** rotates, and as the blocking segments **346** pass by the chamber inlet **336**, the inhalation pressure at the chamber inlet **336** oscillates between a minimum when the restrictor member **342** is a closed position and a maximum when the restrictor member **342** is in an open position.

Referring to FIG. **9**, a fourth embodiment of an OPEP device **430** is shown with a top portion of a housing **432** removed for purposes of illustration. The OPEP device **430** is adapted for connection to a compressed air source (not

US 9,808,588 B1

9

shown), which may be used to rotate a restrictor member **442**. Because compressed air sources are commonly found in hospital settings, the use of compressed air to rotate the restrictor member **442** is convenient. The OPEP device **430** includes a compressed air inlet **462** for connecting to a compressed air hose (not shown) and an exhaust outlet **464** for discharging the compressed air.

Referring to FIG. **10**, a bottom view of the OPEP device **430** is shown with a bottom portion of housing **430** removed. A turbine **466** is rotatably mounted within a turbine housing **468** and includes a plurality of vanes **467** configured such that compressed air entering the compressed air inlet **462** causes the turbine **466** to rotate. As the turbine **466** rotates, the compressed air is discharged out the exhaust outlet **464**.

Referring to FIG. **11**, a cross-sectional perspective view of the OPEP device **430** is shown with a top portion of the housing **432** removed. In this embodiment, a restrictor member **442** and the turbine **466** are joined together along a radial plane by a connecting member **468**. Above the connecting member **468**, a housing **432** surrounds the restrictor member **442** and defines an interior chamber **434**. Below the connecting member **468**, a turbine housing **470** surrounds the turbine **466** and includes the compressed air inlet **466** and the exhaust outlet **464**. Although FIG. **11** illustrates the restrictor member **442** and the turbine **466** as being joined by the connecting member **468**, it should be appreciated that the restrictor member **442** and the turbine **466** may be separate and operatively connected by other means, such as by a shaft. In such a configuration, the housing **432** and the turbine housing **470** may also be separate.

In operation, the OPEP device **430** administers OPEP therapy to a user when it is hooked up to a source of compressed air and a user exhales into a mouthpiece **439**. As compressed air is forced into the turbine housing **470** through the compressed air inlet **462**, the turbine **466** begins to rotate. Because the turbine **466** is connected to the restrictor member **442**, rotation of the turbine **466** also causes the restrictor member **442** to rotate. As the restrictor member **442** rotates, and as blocking segments **446** pass by a chamber inlet **436**, the exhalation pressure at the chamber inlet **436** oscillates between a minimum when the restrictor member **442** is an open position and a maximum when the restrictor member **442** is in a closed position.

Referring to FIG. **12**, a cross-sectional perspective view of a fifth embodiment of an OPEP device **530** is shown. The OPEP device **530** is adapted to provide OPEP therapy using the force of air exhaled into the mouthpiece **539** to rotate the restrictor member **542**, without the aid of a motor or compressed air. In general, the OPEP device **530** includes a housing **532**, an interior chamber **534**, a chamber inlet **536**, a chamber outlet **538**, an exhalation flow path **540**, and a restrictor member **542**.

The restrictor member **542** in the OPEP device **530** includes a plurality of vanes **567** adapted to rotate the restrictor member **542** when a user exhales into the mouthpiece **539**. The restrictor member **542** also includes a blocking segment **546** formed between two adjacent vanes **567**. Thus, when a user exhales into the mouthpiece **539**, air is forced through the chamber inlet **536** and the restrictor member **542** begins to rotate. As the restrictor member rotates, and as the blocking segment **546** periodically passes by the chamber inlet **536**, the exhalation pressure at the chamber inlet **536** oscillates between a minimum when the restrictor member **542** is in an open position and a maximum when the restrictor member **542** is in a closed position.

When the user stops exhaling into the OPEP device **530**, the restrictor member **542** comes to a rest. As shown in FIG.

10

**13**, the restrictor member **542** may come to rest in a closed position where the blocking segment **546** is substantially blocking the flow path **540** through the chamber inlet **536**. If the restrictor member **542** comes to rest in a closed position, a sufficient amount of exhaled air may not enter the interior chamber **534** to initiate the rotation of the restrictor member **542**.

As shown in FIG. **14**, the restrictor member **542** may therefore be weighted to have a center of gravity **572** offset from its axis of rotation. Based on the location of the center of gravity **572** of the restrictor member **542**, gravity may be used to ensure that the restrictor member **542** comes to rest in an open position when the OPEP device **530** is held upright.

Alternatively, as shown in FIG. **15**, the housing **532** of the OPEP device **530** may also include a one-way valve **574** configured to allow air to enter the interior chamber **534** through the valve opening **575** upon inhalation. The one-way valve **574** prevents air from exiting the interior chamber **534** during exhalation. In this configuration, the OPEP device **530** is adapted to restrict exhaled air flowing out of the interior chamber **534** at the chamber outlet **538**. Thus, when a user exhales into the mouthpiece **539** and through the chamber inlet **536**, the restrictor member **542** rotates, and the blocking segment **546** periodically restricts the flow of exhaled air through the chamber outlet **538**. As the user exhales, the exhalation pressure at the chamber outlet **538** oscillates between a minimum and a maximum in the same manner as explained above, which is effectively transmitted back to the user for the administration of OPEP therapy. In this configuration, the chamber inlet **536** is large enough such that the blocking segment **546** does not substantially restrict the cross sectional area of the flow path **540** through the chamber inlet **536**.

However, if the restrictor member **542** comes to rest in a position where the blocking segment **546** is restricting the flow of air through the chamber outlet **538**, a sufficient amount of exhaled air may not pass along the exhalation flow path **540** through the chamber outlet **538** to initiate rotation of the restrictor member **542**. In this situation, a user may inhale to open the one-way valve **574** and permit air to flow through the valve opening **575**, into the interior chamber **534**, and through the chamber inlet **536**, thereby initiating rotation of the restrictor member **542**, and moving the blocking segment **546** to a position where it is not restricting the flow of air through the chamber outlet **538**. After the blocking segment **546** has moved to a position where it is not restricting the flow of air through the chamber outlet **538**, a user may exhale to begin administration of OPEP therapy.

As in the previous embodiments, the housing **532** is preferably openable so that the housing **532** and the parts contained therein may be periodically accessed, cleaned, or replaced. Referring to FIGS. **16**A-C, top views of various restrictor members **542** are shown. The restrictor members **542** may have any number of vanes **567** and blocking segments **546**. Furthermore, the blocking segments **546** may extend only a portion of the way between adjacent vanes **567**. In this regard, the OPEP device **530** is highly configurable to achieve a specific oscillating frequency of the exhalation pressure. A user of the OPEP device **530** can change the oscillation frequency by simply selecting a different restrictor member **542** and replacing the existing restrictor member **542** in the OPEP device **530**.

Referring to FIGS. **17-18**, a cross-sectional view of a sixth embodiment of an OPEP device **630** is shown. The OPEP device **630** is adapted to provide both OPEP therapy and, when connected to a nebulizer **652**, the simultaneous admin-

US 9,808,588 B1

11

istration of OPEP and aerosol therapies. In this embodiment, the OPEP device **630** includes a respiratory portal **654** for fluidly interconnecting a mouthpiece **639**, a chamber inlet **636**, and a nebulizer port **656**.

As shown in FIG. **17**, the OPEP device **630** is configured for the delivery of OPEP therapy only. In this configuration, the OPEP device **630** may include an end cap **658** for regulating the flow of air through the nebulizer port **656**. The end cap **658** may include a one-way valve **659** configured so that air may enter the respiratory portal **654** through the nebulizer port **656** on inhalation, but block the flow of air out of the nebulizer port **656** upon exhalation. Thus, a user may inhale air through the one way valve **659** and the mouthpiece **639** upon inhalation, and upon exhalation, receive OPEP therapy as the one way valve **659** closes and exhaled air is forced through the chamber inlet **636**. At the chamber inlet **636**, a flow path **640** is periodically restricted by a rotating restrictor member **642**, thereby generating an oscillating exhalation pressure as previously described. As explained above in reference to FIGS. **12-14**, the restrictor member **642** may also be weighted to have a center of gravity **672** offset from its axis of rotation so that it comes to rest in an open position when the OPEP device **630** is held upright.

As shown in FIG. **18**, the OPEP device **630** is connected to the nebulizer **652** and configured for the simultaneous administration of OPEP and aerosol therapies. In this configuration, the end cap **658** has been removed and a nebulizer output **660** has been attached to the nebulizer port **656** on the respiratory portal **654**. A one-way valve is not needed when attached to the nebulizer **652** because most commercially available nebulizers include a valve means for regulating the flow of the aerosol contained therein. This configuration operates in the same manner as described above in reference to FIG. **17**, except that an aerosol is drawn from the nebulizer output **652** through the chamber inlet **636** upon inhalation. Thus, a user may simultaneously receive OPEP therapy upon exhalation and aerosol therapy upon inhalation.

An advantage of the embodiment of FIG. **18** is that an inhalation flow path **641** from the nebulizer **656** to the user substantially avoids the exhalation flow path **640**. As such, when the OPEP device **630** is connected to the nebulizer **656** for example, aerosol medicament does not get stuck in the interior chamber **634**. In this manner, loss of medicament and contamination of the interior chamber **634** may be reduced.

In each of the embodiments described above, movement of the restrictor member from the closed position to an open position, or from an open position to a closed position, does not depend on the exhalation pressure at the chamber inlet reaching a predetermined level, the attainment of which is necessarily influenced by various human factors, including the user's exhalation flow rate. In this manner, the restrictor member maintains a consistent oscillation frequency and improves the effectiveness of OPEP therapy administered to users.

Although the description of the embodiments described above refer to the administration of OPEP therapy on exhalation, it should be appreciated that such embodiments are also configurable for the administration of oscillating pressure therapy upon exhalation only, inhalation only, or both exhalation and inhalation. Accordingly, the terms "oscillating positive respiratory pressure" and "oscillating positive expiratory pressure," or "OPEP," may be used interchangeably. Similarly, the term "respiratory" may refer to inhalation, exhalation, or both inhalation and exhalation.

12

Use of any such term should not be construed as a limitation to only inhalation or only exhalation.

The foregoing description of the inventions has been presented for purposes of illustration and description, and is not intended to be exhaustive or to limit the inventions to the precise forms disclosed. It will be apparent to those skilled in the art that the present inventions are susceptible of many variations and modifications coming within the scope of the following claims.

What is claimed is:

1. A respiratory treatment device comprising:
an inlet configured to receive exhaled air into the device;
an outlet configured to permit air to exit the device;
an opening positioned in an exhalation flow path defined between the inlet and the outlet;
a blocking segment configured to rotate relative to the opening between a closed position where the flow of air through the opening is restricted, and an open position where the flow of air through the opening is less restricted; and,
a vane configured to rotate the blocking segment between the closed position and the open position in response to the flow of air through the opening;
wherein a size of a blocking surface of the blocking segment is equal to or greater than a size of the opening.

2. The respiratory treatment device of claim **1**, wherein the blocking segment is mounted on the vane.

3. The respiratory treatment device of claim **2**, wherein the blocking segment is mounted to the vane at an obtuse angle.

4. The respiratory treatment device of claim **1**, wherein the blocking segment and the vane are rotatable about an axis of rotation perpendicular to a direction of the flow of air through the opening.

5. The respiratory treatment device of claim **1**, wherein the blocking segment and the vane have a combined center of gravity offset from the axis of rotation.

6. The respiratory treatment device of claim **1**, wherein the blocking segment and the vane are biased during a period of no air flow through the opening solely by a weight of gravity.

7. The respiratory treatment device of claim **1**, wherein the flow of air through the opening is completely blocked when the blocking segment is in the closed position.

8. The respiratory treatment device of claim **1**, wherein the blocking surface of the blocking segment contacts the opening when the blocking segment is in the closed position.

9. A respiratory treatment device comprising:
an inlet configured to receive exhaled air into the device;
an outlet configured to permit air to exit the device;
an opening positioned in an exhalation flow path defined between the inlet and the outlet, the opening having a generally oblong cross-sectional shape comprising a shorter first dimension and an elongated second dimension perpendicular to the first dimension; and,
a blocking segment configured to translate relative to the opening along the shorter first dimension between a closed position where the flow of air through the opening is restricted, and an open position where the flow of air through the opening is less restricted;
wherein a size of a blocking surface of the blocking segment is equal to or greater than a size of the opening.

10. The respiratory treatment device of claim **9**, wherein the oblong cross-sectional shape is generally rectangular.

11. The respiratory treatment device of claim **9**, further comprising a conduit having a length terminating at the

US 9,808,588 B1

13

opening, wherein a cross-sectional shape of the conduit along the length matches the cross-sectional shape of the opening.

**12**. The respiratory treatment device of claim **11**, wherein a cross-sectional area of the conduit is less than a cross-sectional area of an opening associated with a patient interface located upstream of the conduit.

**13**. The respiratory treatment device of claim **9**, further comprising a vane configured to move the blocking segment between the closed position and the open position in response to the flow of air through the opening.

**14**. The respiratory treatment device of claim **13**, wherein the blocking segment is mounted on the vane.

**15**. The respiratory treatment device of claim **9**, wherein a side profile of the blocking segment, in the direction of the elongated second dimension, is shaped to mate with a side profile of the opening, when the blocking segment is in the closed position.

**16**. The respiratory treatment device of claim **9**, wherein the flow of air through the opening is completely blocked when the blocking segment is in the closed position.

**17**. The respiratory treatment device of claim **9**, wherein the blocking surface of the blocking segment contacts the opening when the blocking segment is in the closed position.

**18**. A respiratory treatment device comprising:

an inlet configured to receive exhaled air into the device;

an outlet configured to permit air to exit the device;

an opening positioned in an exhalation flow path defined between the inlet and the outlet, and,

a blocking segment configured to translate relative to the opening between a closed position where the flow of air through the opening is restricted, and an open position where the flow of air through the opening is less restricted;

14

wherein a side profile of the blocking segment is shaped to mate with a side profile of the opening, when the blocking segment is in the closed position; and,

wherein a size of a blocking surface of the blocking segment is equal to or greater than a size of the opening.

**19**. The respiratory treatment device of claim **18**, wherein the side profile of the blocking segment and the side profile of the opening are curved to mate with one another.

**20**. The respiratory treatment device of claim **18**, further comprising a vane configured to move the blocking segment between the closed position and the open position in response to the flow of air through the opening.

**21**. The respiratory treatment device of claim **20**, wherein the blocking segment is mounted on the vane.

**22**. The respiratory treatment device of claim **18**, further comprising a conduit having a length terminating at the opening, wherein a cross-sectional shape of the conduit along the length matches a cross-sectional shape of the opening.

**23**. The respiratory treatment device of claim **22**, wherein the opening has a generally oblong cross-sectional shape comprising a shorter first dimension and an elongated second dimension perpendicular to the first dimension.

**24**. The respiratory treatment device of claim **23**, wherein the blocking segment is configured to translate relative to the opening along the shorter first dimension between the closed position and the open position.

**25**. The respiratory treatment device of claim **18**, wherein the flow of air through the opening is completely blocked when the blocking segment is in the closed position.

**26**. The respiratory treatment device of claim **18**, wherein the blocking surface of the blocking segment contacts the opening when the blocking segment is in the closed position.

\* \* \* \* \*